**Glenn Edward HOOVER,**
**#131–295, Appellee,**

v.

**STATE OF MARYLAND, Appellant.**

**No. 83–6022.**

United States Court of Appeals,
Fourth Circuit.

Argued April 12, 1983.
Decided July 28, 1983.

Carmina Szunyog, Asst. Atty. Gen., Baltimore, Md. (Stephen H. Sachs, Atty. Gen. of Maryland, Stephen Rosenbaum, Philip M. Andrews, Asst. Attys. Gen., Baltimore, Md., on brief), for appellant.

Jon H. Grube, Baltimore, Md. (Smith, Somerville & Case, Baltimore, Md., on brief), for appellee.

Before HALL and ERVIN, Circuit Judges, and TURK,* District Judge.

ERVIN, Circuit Judge:

After exhausting his state remedies, Glenn Edward Hoover, a Maryland prisoner convicted of second degree murder, sought a federal writ of habeas corpus pursuant to 28 U.S.C. § 2254. The district court found that the state trial judge had abridged Hoover's fourteenth amendment right to confront adverse witnesses by limiting cross-examination of a key prosecution witness. The district court further concluded that

* Honorable James C. Turk, Chief United States District Judge for the Western District of Virginia, sitting by designation.

this error was not harmless, and issued the writ subject to retrial by the state. Maryland appeals, and we now affirm.

## I.

Hoover was convicted by a jury in Baltimore County circuit court of second degree murder in connection with an attempted burglary carried out, the state's evidence showed, by Hoover, Douglas Martin, John Widener, and Paul Greer. Hoover apparently was unarmed during the entire episode, and the murder weapon was fired by Martin. In return for a grant of immunity, Greer turned state's evidence and was the chief prosecution witness at the separate trials of Widener, who was acquitted, and Hoover, who was convicted. On this appeal, Maryland does not, and cannot, contest seriously Hoover's contention that Greer's testimony was vital to the prosecution's case. The issue before both the district court and this court is whether the state trial court unconstitutionally limited Hoover's ability to bring out on cross-examination of Greer the concrete details of the agreement Greer made with the government.

In his opening statement the prosecuting attorney informed the jurors that "one of the principal witnesses for the State" was Greer, that Greer had also been charged with the murder, and that he would elaborate later on what Greer was offered in return for his testimony. The prosecutor at that time stated only that "part of the consideration" for Greer's testimony was a state grant of "immunity from prosecution," with no explicit specification of what prosecutions the immunity grant covered. In direct examination of Greer later in the trial, the prosecutor asked Greer if he had been charged with the murder, and if he had received "immunity from prosecution ... in this case" in return for testifying, both of which questions Greer answered in the affirmative. The prosecutor then entered into evidence the letter granting Greer immunity, which reads:

Regarding our conversation of January 14, 1974, please be advised that the State will enter a Nol Pros as to all pending charges in Baltimore County against your client, Greer, at the conclusion of the trials of the captioned defendants. It is realized, however, that this action will be taken by the State upon Greer testifying against the three co-defendants in the pending murder case; that is, the testimony that he previously agreed orally to furnish implicating the other three defendants and his entire knowledge of the crime.

The State also agrees to contact the State's Attorney's Office in York County, Pennsylvania, in reference to the matter pending against your client in that jurisdiction informing that office as to the results of your client's testimony in our case.

It is also agreed that no charges will be brought or information released against Greer for any information furnished by him about any other crimes unless they involve physical harm to human beings.

Greer recounted the events of the crime, portraying himself as an innocent along for a simple stick-up or break-in which turned ugly. Greer testified that when he realized the house to be burglarized was occupied he tried to persuade the others to leave, and, failing in that, insisted that he was not going into the house and would serve only as lookout.

On cross-examination, defense counsel attempted to bring out the details of Greer's immunity agreement with the state. This attempt was repeatedly frustrated by the trial judge, with the result that only the fact that there was such an agreement, and the bare wording of the immunity letter, were put before the jury. Defense counsel was prevented totally from developing Greer's understanding of what concrete benefits he would receive from the agreement.[1]

1. Hoover's counsel, Charles L. Shuman, Esq., began exploring the nature of the immunity agreement early in his cross-examination of Greer:

Q. All right; as a result of agreeing to testify against Mr. Hoover, you have been granted immunity; is that correct?

A. Yes, sir.

Q. Is that correct?

THE COURT: He said yes.

MR. SHUMAN: He said yes; all right.

Q. (By Mr. Shuman) Now, have you not been granted immunity on other charges besides this homicide?

MR. TOWNSEND [William S. Townsend, Esq., assistant state's attorney]: May it please the Court, the immunity agreement is in the record.

THE COURT: Yes.

DEFENSE COUNSEL: Your Honor, I want to go into that.

THE COURT: Hand that to Mr. Shuman.

Q. (By Mr. Shuman) All right; as part of your immunity, it says here the State also agrees to contact the State's Attorney's office in York County, Pennsylvania with reference to matters pending against you there. What were those matters?

MR. TOWNSEND: Objection.

THE COURT: Sustained.

MR. SHUMAN: Your Honor, this is cross-examination here.

THE COURT: You may only ask the witness to impeach him about any convictions. That's what the rule is.

Q. (By Mr. Shuman) Have you been involved in any burglaries—

MR. TOWNSEND: Objection—

Q. (By Mr. Shuman)—since—

MR. TOWNSEND: Objection.

THE COURT: Sustained. Mr. Shuman, the law is to impeach a witness you may ask him about any conviction when he was represented by counsel or where he effectively waived counsel; that's all.

MR. SHUMAN: Your Honor, I understand that; but I think there's some latitude involved on that where a person can be asked about other matters which affect his—

THE COURT: No, sir.

MR. SHUMAN:—his morality.

THE COURT: No. The Supreme Court of the United States held that goes to impeachment. Anything short of that does not impeach.

. . . . .

Q. (By Mr. Shuman) Have you been convicted of a larceny of a safe?

A. No, sir.

Q. In Pennsylvania?

A. No, sir.

Q. You have not been?

A. No, sir.

Q. Have you been convicted of the larceny of some logs in Pennsylvania?

A. No, sir.

Q. Does the grant of immunity which the State has given you include any immunity from punishment for the possible sentencing of a larceny of a safe?

MR. TOWNSEND: Objection, Your Honor.

THE COURT: The agreement is in evidence. Whatever the agreement says, it says.

MR. SHUMAN: May I approach the Bench, Your Honor?

THE COURT: Yes.

AT THE BENCH

MR. SHUMAN: Defendant's Counsel is proffering to clear up the matters which are pending in York County, Pennsylvania, against the prosecuting witness Greer. The question does not refer to convictions, but only refers to clarification of the pending matters in Pennsylvania.

THE COURT: The fact that matters are pending in Pennsylvania does not go to impeach the witness. The witness is presumed to be innocent of such charge until proven guilty, and the Court will not permit the question. The Court may when the time of argument arrives permit Mr. Shuman to read anything that he wants to read from the immunity letter, and to argue any reasonable inferences from that letter; but I am not going to permit any further questions about it.

MR. SHUMAN: Thank you, Your Honor.

IN OPEN COURT

Q. (By Mr. Shuman) Mr. Greer, in addition to the immunity that you have been granted, are there any other fringe benefits involved in this?

MR. TOWNSEND: Objection. If Your Honor please, will Counsel be more specific as to what he means by fringe benefits?

THE COURT: Were you promised anything in the grant of immunity other than what is set forth in that letter?

WITNESS: Nothing, Your Honor.

MR. SHUMAN: All right, Your Honor, I withdraw the question.

THE COURT: All right.

Some time later, defense counsel returned to the subject of the immunity grant:

Q. Now, this immunity that you have been granted by the State, how many years in jail do you think you're going to save?

MR. TOWNSEND: Objection, Your Honor, that's really—

THE COURT: Sustained.

MR. TOWNSEND: —conjecture.

THE COURT: Sustained.

Finally, at the very end of his cross-examination, defense counsel tried one more time:

Q. Now don't answer the next question until Mr. Townsend has a chance to object. Have you ever given the police in Baltimore County information about other burglaries which have occurred?

MR. TOWNSEND: I object.

THE COURT: Sustained.

It is clear, we think, that the trial judge was laboring under a misapprehension of the nature of the attempted cross-examination, the objec-

On direct appeal, the Maryland Court of Special Appeals briefly reviewed the issue now before us and concluded that the subject of the immunity agreement was "fully explored" before the jury. *Hoover v. State,* No. 1065 (Md.Spec.App. June 12, 1975) (unreported). The Maryland Court of Appeals denied Hoover's petition for review.

## II.

■ The constitutional right of confrontation guaranteed to a state criminal defendant by the fourteenth amendment has as one of its most important aspects the right to cross-examine a hostile witness in order to undermine the credibility of the witness by highlighting the possible influence of bias on the testimony of the witness. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The trial judge may limit such cross-examination only to preserve the witness' constitutional immunity from self-incrimination, to prevent attempts to harass, humiliate or annoy him, *id.* at 320, 94 S.Ct. at 1112, or where the information sought might endanger the witness' personal safety. *Chavis v. North Carolina,* 637 F.2d 213, 226 (4th Cir.1980). When such factors are not present, substantial limitations on the attempts of a defendant to undermine as biased a witness' testimony constitute constitutional error.

■ The trial judge's traditional discretion to control the limits of cross-examination cannot be exercised until "the constitutionally required threshold level of inquiry has been afforded the defendant." *United States v. Tracey,* 675 F.2d 433, 437 (1st Cir.1982). Moreover, any exercise of discretion once that threshold is reached must be informed by "the utmost caution and solicitude for the defendant's Sixth Amendment rights." *United States v. Houghton,* 554 F.2d 1219, 1225 (1st Cir.1977), *cert. denied,*

434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). "Especially where the witness is an accomplice of the defendant or may have some other substantial reason to cooperate with the government, the defendant should be permitted wide latitude in the search for the witness' bias." *Tracey,* 675 F.2d at 438.

■ In a decision subsequent to its affirmance of Hoover's conviction, the Maryland Court of Special Appeals identified what we agree is "the crux of the inquiry" into the credibility of a government witness testifying pursuant to an immunity grant or plea bargain: "the witness's state of mind. What is essential to the preservation of the right to cross-examine is that the interrogator be permitted to probe into whether the witness is acting under a hope or belief of leniency or reward." *Fletcher v. State,* 50 Md.app. 349, 437 A.2d 901, 906 (1981). What is crucial is not the government's understanding of what it is offering in exchange for the testimony. Nor is it what the common law's "reasonable man" might understand an immunity letter to grant. The vital question, which the defendant is constitutionally entitled to explore by cross-examination, is what the *witness* understands he or she will receive, for it is this understanding which is of probative value on the issue of bias. The likelihood that a prosecution witness is shading or even contriving testimony adverse to the defendant reasonably can be viewed as directly correlated with the perceived value of such testimony to the witness.

■ It is this very question, of Greer's understanding of his stake in testimony adverse to Hoover, which received no answer at Hoover's trial because of the mistaken[2] interventions of the trial judge. Hoover's counsel was not permitted to inquire into the nature of the Pennsylvania charges in which Maryland had promised to intervene

tive of which was to uncover Greer's own understanding of the benefits he would receive from testifying. The trial judge construed defense counsel's questions, however, as intended to impeach Greer's honesty by showing prior bad acts and so forbade questions concerning anything but criminal convictions. Because the concern of defense counsel was to demon-

strate bias, not dishonesty, the traditional rule limiting impeachment to convictions was inapplicable.

**2.** As we observed above, the trial judge's actions were undertaken with the best of motives, a desire to prevent improper impeachment by prior bad acts. But such was not the object of the proposed line of cross-examination. *See* footnote 1, *supra.*

in some indeterminate fashion on behalf of Greer. The trial judge took over and effectively curtailed defense counsel's exploration into other fringe benefits of the immunity arrangement. The judge indicated his belief that the letter granting immunity was the only evidence on the contents of the immunity agreement needed by the jury. The court refused to permit Greer to be questioned about the amount of time in prison he thought he was avoiding by testifying against Hoover. Greer's answer to defense counsel's final question about what other information Greer had supplied the police would have been relevant to indicate the extent of the legal trouble Greer believed himself to be escaping by testifying. The meaning and value of the last paragraph in the immunity letter to Greer [3] could not be explored at all because of the trial judge's interventions.

This sustained and effective refusal to permit inquiry into Greer's subjective understanding of his bargain with the government stepped beyond the constitutional bounds of the trial court's discretion, and abridged the fundamental right to confront adverse witnesses secured to Hoover by the fourteenth amendment.

### III.

■ On appeal, the state maintains that even if the trial judge's actions were consti-

tutional error, the error must be judged harmless in the context of this case.[4]

"Harm is presumed to have come from the constitutional error, and the state has the 'heavy burden' of proving harmlessness beyond a reasonable doubt." *Anderson v. Warden*, 696 F.2d 296, 300 (4th Cir.1982) (*en banc*) (citation omitted). The state has not carried its "heavy burden" in the present case. The state trial court's interference with Hoover's counsel's attempts to undermine Greer's credibility was pervasive and the issues which defense counsel sought to develop were highly relevant. Greer was the key to the prosecution case, and if the jury doubted his story there would have been little else on which to base a guilty verdict. None of the factors justifying the limitation of cross-examination in this type of situation (a need to safeguard the witness' constitutional immunity from self-incrimination, or to protect the witness from attempts to harass or humiliate or from the possibility of physical harm) were present.

Finally, it is significant that Widener, the leader of the criminal enterprise according to the state's version of the facts, was acquitted after a trial in which defense counsel was permitted to question Greer about the details of his immunity agreement, while Hoover, in whose trial those details remained unexplored, was convicted.

---

**3.** "It is also agreed that no charges will be brought or information released against Greer for any information furnished by him about any other crimes unless they involve physical harm to human beings."

**4.** Hoover argues that this type of error should be deemed reversible error *per se*, and not susceptible to harmless error analysis. Some Supreme Court decisions provide support for this contention. *See Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 749–50, 19 L.Ed.2d 956 (1968); *Brookhart v. Janis*, 384 U.S. 1, 3, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966). *See* 3A C. Wright, *Federal Practice & Procedure: Criminal 2d* § 855 (1982) ("It is probably also still true, as earlier cases had held, that there must be reversal . . . if the defendant has been denied the right of cross-examination."). *Brookhart,* however, predates the Supreme Court's announcement of a "harmless-constitutional-error rule" in *Chapman v. California,* 386 U.S. 18, 22–4, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967), and *Smith,* which involved the deni-

al to the defendant of the right to ask the principal government witness his name and address, may be distinguishable on its facts. Therefore, we assume without deciding that the abuse of a trial court's discretion to limit cross-examination may be constitutional but nevertheless harmless error. *But see Cox v. State,* 51 Md.App. 271, 443 A.2d 607, 619–20 (1982) (Lowe, J., dissenting):

I do not believe that an improper interference with the right to test a witness's credibility could be harmless. It is perhaps for that reason that this issue has been treated traditionally as a discretionary exercise rather than an evidentiary rule of right or wrong. If a judge's discretion in this case is abused, it necessarily means that he has crossed the demarcation of his discretionary authority and the error is of constitutional dimension. But if he has not crossed that line of discretionary responsibility, we cannot interfere.

Given these facts, we cannot conclude beyond a reasonable doubt "that there was no reasonable *possibility* that the error might have contributed to the conviction." *Cox v. State*, 51 Md.App. 271, 443 A.2d 607, 614 (1982) (emphasis in original).

### IV.

We agree with the district court's conclusions that Hoover's trial was marred by substantial constitutional error, and that the state has not shown this error to be harmless beyond a reasonable doubt. The judgment of the district court is affirmed.

AFFIRMED.

K.K. HALL, Circuit Judge, dissenting:

I cannot agree with the majority's conclusion that Hoover's constitutional right of confrontation was abridged. In my view, the issue of Greer's bias was fairly put to the jury in this case. Therefore, the limitations placed by the trial judge on defense counsel in cross-examining Greer were within the acceptable range of the court's discretion and do not rise to the level of constitutional error. For this reason, I dissent.

The murder victim, Howard Clyde Bull, was a 58-year old dirt farmer, who lived with his 63-year old sister, Evelyn Bull, on a farm in Baltimore County. According to the evidence adduced at Hoover's trial, on the evening of June 20, 1973, Hoover, Greer, Martin, and Widener met at Hoover's house to "go on a job." After Widener announced that there was going to be "a stickup," the four men put stockings over their heads and arrived at Bull's farmhouse around 11:00 p.m. Greer remained outside as a lookout. The other three, including Hoover, entered the house, after kicking down the kitchen door. They confronted Mr. Bull and demanded money. When Mr. Bull cried out, "Oh for God's sake, I got nothing, I don't make nothing," Martin took the shotgun he was carrying and, according to the victim's sister, "just shot his brains right out and run out."

As the majority opinion correctly notes, the testimony of Greer, who had been granted immunity from prosecution in this case and other matters was a key factor in securing Hoover's conviction. In the case relied on by the majority, *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Supreme Court held that a trial court's restrictions on the cross-examination of a key prosecution witness violated the defendant's Sixth Amendment rights, where those restrictions precluded defendant's counsel from making a record from which he could argue why the witness might have been biased. However, in so holding, the Court noted:

> *On these facts* it seems clear to us that ... defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness. *Id.* at 318, 94 S.Ct. at 1111 (emphasis added).

As Justice Stewart pointed out in his concurring opinion in *Davis*, "[s]uch cross-examination was necessary in this case in order 'to show the existence of possible bias and prejudice...,'" and the right to such cross-examination would not necessarily be conferred in every case. *Id.* at 321, 94 S.Ct. at 1112.

The case before us is simply not comparable to the *Davis* situation. In this case, the jury had abundant evidence of Greer's possible bias and motive for testifying against Hoover. First and foremost, the jurors knew that Greer was immunized from the charge of first-degree murder for which Hoover was being tried. Secondly, the written letter containing the immunity agreement was itself admitted into evidence. This document alerted the jury to the fact that Greer was being granted immunity for other crimes in Maryland and that the state would intercede on Greer's behalf for criminal activity in Pennsylvania. In addition, on cross-examination by Hoover's attorney, Greer testified that he was not "promised anything in the grant of immunity other than what is set forth in that letter," and acknowledged that he had been told he might be eligible for part of a monetary reward. Both the prosecutor and

defense counsel referred to Greer's grant of immunity in their opening statements to the jury.[1] And finally, the trial judge in his instructions to the jury explicitly pointed out that because of the immunity grant Greer's testimony was suspect.

The only question in this case is whether the trial court cut off cross-examination too quickly, a matter in which the judge has wide discretion. Where the jury, as here, has been exposed to sufficient facts concerning the bias of a witness testifying under a grant of immunity, the tiral court does not not abuse its discretion in preventing further inquiry into the details of the immunity agreement. *See United States v. Summers*, 598 F.2d 450, 459–463 (5th Cir. 1979); *United States v. Elliott*, 571 F.2d 880, 908–09 (5th Cir.1978). Certainly, there was sufficient cross-examination in this case to satisfy the Sixth Amendment. Thus, the trial court's refusal to permit Hoover's attorney to delve into the details of Greer's immunity agreement with the state and to probe the precise number and nature of the charges possibly pending against him was entirely proper. Because I perceive no constitutional error and can find no abuse of the trial court's discretion, I would, accordingly, reverse the district court's judgment, which set aside Hoover's conviction.

1. Specifically, Hoover's counsel argued:

   Incidentally, I might add that Greer for whom I have utter contempt is a man with an extensive criminal record. I'm not going to go into that now, but I want you as the case progresses, this will be brought out and naturally I needn't tell you common sense tells you that a man with a criminal record who has a lot to gain and very little to lose is a man whose testimony is suspect.... Don't forget he was one of the four that were charged with participating in the murder of this poor farmer. Don't forget another thing ... this man is facing God knows how many years, fifty, sixty years or seventy years ... On top of that he's eligible for a part of a reward which was offered and properly offered by the citizens of Baltimore County.

Incidentally, this man has preyed on the citizens of Baltimore County for a long time.... I'm appalled at the fact that the State of Maryland has got to base a case on the testimony of such trash as Mr. Greer....

\* \* \* \* \* \*

This man is such a vicious unprincipled crook—I don't know if crook is enough, if crook is sufficient to describe this man—but let's say he is a person of unconcerned morality. Of unconcerned morality is the best way I can describe him. This is the man that's going to testify for the State ... this case is going to boil down to one thing—credibility. Can you believe this shall I say this human being who has so much to gain and nothing to lose? ...