STATE of Wisconsin, Plaintiff-Respondent,

v.

Carlos DELGADO, Defendant-Appellant.

Court of Appeals

*No. 94–1501–CR. Submitted on briefs February 7, 1995.—Decided May 23, 1995.*

(Also reported in 535 N.W.2d 450.)

739

For the defendant-appellant the cause was submitted on the briefs of *William J. Tyroler*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Jerome S. Schmidt*, assistant attorney general.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SCHUDSON, J. Carlos Delgado appeals from the judgment of conviction, following a jury trial, for first-degree intentional homicide while armed, party to the crime, and from the denial of his postconviction motion. He offers several challenges to his trial attorney's performance and to the trial prosecutor's conduct. We conclude that Delgado's trial attorney's performance was deficient for failing to impeach the State's principal witness with readily available evidence that would have shown, first, that the witness had been promised substantial consideration in exchange for his testimony and, second, that the witness lied about whether he had been promised anything. We also conclude that this deficient performance was prejudicial and, therefore, we reverse.

In the early morning hours of July 12, 1992, Alfonso Quesada was murdered by some person or persons who fired eight bullets into his head at close range. Delgado and Lashun McGee were arrested for the crime and charged as parties to first-degree intentional homicide while armed. McGee, however, soon became the State's principal witness, testifying at both Delgado's preliminary hearing and jury trial.

At the trial, McGee testified that he was a member of the Young Spanish Cobras and that Delgado was a member of the Spanish Cobras. McGee said that he was in a van with Delgado when, by chance, they came upon Quesada. McGee testified that Delgado, referring

741

to Quesada, said that he (Delgado) was "going to check this nigger out'" and then exited the van. McGee said that he stayed in the van and, in the side-view mirror, saw Delgado "throwing" signs of the Latin Kings as if "representing" to Quesada that Delgado was a Latin King. McGee said that after Delgado and Quesada talked for a minute or so, he heard a shot and, in the side-view mirror, saw Delgado shooting Quesada in the head. McGee said that Delgado then returned to the van and told him that he had shot Quesada " 'cause the nigger was a flake,' " meaning that Quesada was a rival of the Spanish Cobras.

Police recovered the murder weapon from McGee's home. McGee told police that Delgado had committed the murder and had given him the gun. When the police arrested Delgado and Detective Patrick Kennedy first attempted to interview him, Delgado was upset and declined to make a statement. Detective Procopio Sandoval testified, however, that he (Sandoval) subsequently interviewed Delgado, found him cooperative, and obtained a full confession, although Delgado refused to sign it. The next day, Delgado declared his innocence when interviewed by an assistant district attorney.

Delgado's alleged confession to Detective Sandoval conflicted with McGee's account of the murder and the physical evidence in several ways. First, according to Delgado's confession, the murder occurred on National Avenue. According to McGee and the physical evidence, it occurred in an alley behind National Avenue. Second, according to Delgado's confession, Delgado knew Quesada, walked up to him and, without conversation, shot him in the face. According to McGee, however, Delgado and Quesada flashed gang signs and conversed for about a minute before the shooting. Fur-

ther, the physical evidence showed no shots to the face, but rather, one shot to the right side of the head and seven shots to the back of the head. Third, according to Delgado's confession, Delgado and McGee went out looking for Quesada and, when they saw him walking on National Avenue, Delgado got out of the van. According to McGee, however, he and Delgado were stopped on National Avenue because the van had broken down when, by chance, Quesada appeared.

At trial, Delgado denied any involvement in the murder. He and four other defense witnesses also testified that McGee admitted and bragged about killing Quesada. Delgado's defense also included testimony from two alibi witnesses who said they were at home with Delgado at the time of the murder.

Delgado argues that his trial attorney was ineffective for failing to impeach McGee based on information that first surfaced at the preliminary hearing. Under cross-examination at Delgado's preliminary hearing McGee testified:

Q: Have you been charged in this case, sir?
A: Yes.
Q: Anybody make any promises or threats to get you to testify today?
A: No, they didn't.
Q: You haven't had any promises made to you; is that right?
A: Right.

At the conclusion of the preliminary hearing testimony, however, McGee's defense attorney, advised the court:

[McGee's attorney]: The record should reflect one thing. I think that my client, when he testified, *he misspoke in some response to the questions from*

*Mr. Delgado's lawyer in regard to any promises or assurances.* There have been discussions between me and [the prosecutor] or—obviously, Mr. Delgado—I mean, *Mr. McGee would not have testified*—there have been no finalized discussions, but, there have been discussions.

[The prosecutor]: I believe that's a correct statement.

[McGee's attorney]: And *that was the basis of my decision to allow my client to testify in this case,* at this state.

[Delgado's attorney at the preliminary hearing]: Fine. So, now the record reflects that Mr. McGee has testified, and now we have a statement by his lawyer as to the worth of that testimony.

[McGee's attorney]: I just wanted—I didn't want to leave—I felt, as an officer of the Court, I had a duty to respond to what I felt was not—perhaps not a complete answer to that one issue.

(Emphasis added.)

Under cross-examination at Delgado's trial, McGee again testified that he had been promised nothing.

Q: Mr. McGee, isn't it correct that you have in this case, that you have made a deal for your testimony?

A: No.

Q: You haven't made any sort of deal at all?

A: No, I haven't.

Q: . . . So you're telling us, Mr. McGee, that nothing was promised to you in return for cooperating and testifying in this case?

A: Correct.

McGee, however, had been promised something. At the postconviction hearing the specific promises and inducements were introduced through the undisputed

affidavit of McGee's defense attorney who stated, in part:

> Prior to my receiving notification from the public defender office of my appointment [to represent McGee on the charge of first degree intentional homicide while armed party to the crime] I was contacted by the prosecutor in this case . . . . It was from [the prosecutor] that I learned that I had been appointed to represent Mr. McGee. [The prosecutor] said that he greatly desired having Mr. McGee testify against the codefendant, Carlos Delgado, at the preliminary hearing. *In exchange for such testimony and for waiving Mr. McGee's own preliminary hearing, [the prosecutor] said that he would file an information on some non-homicide charge.* [The prosecutor] made no firm commitment as to the nature of this lesser charge, but said that he was thinking of charging the crime of aiding a felon, § 946.47, STATS.

> In response to this offer from [the prosecutor], I discussed the matter with Mr. McGee. I told Mr. McGee that [the prosecutor] had approached me with this offer, which I characterized as very unusual. I also told Mr. McGee that I did not know what would ultimately happen, and that although I thought that the state would not be able to prove the case against him in any event, *if he did agree to testify against Mr. Delgado, Mr. McGee's chances of obtaining dismissal would certainly be helped.* Mr. McGee said that he did not want to take any chances, and he agreed to testify against Mr. Delgado at the preliminary hearing.

> . . . Mr. McGee waived his preliminary hearing . . . and was charged with aiding a felon, a Class E felony. Mr. McGee testified against Mr. Delgado at the latter's trial [on October 27, 1992], and on

745

November 2, 1992, on the prosecutor's motion, the aiding a felon charge was dismissed.

I was present in court during portions of the Delgado jury trial, including during the testimony given by Mr. McGee. I was never contacted, either before or during the trial, by Mr. [Delgado's trial counsel] . . . and I never had occasion to discuss with him any aspect of this case.

(Emphasis added.) Further, although there was some dispute about whether McGee's bail was reduced in exchange for his cooperation, or out of concern for his safety within the jail, or both, there is no dispute that a condition of his release was that "he cooperate fully with the State and the prosecution of Carlos Delgado."

Delgado's trial attorney testified at the postconviction hearing. Just as he had emphasized in his opening statement and closing argument to the jury, he acknowledged that his "theory of defense [was] that McGee was motivated to lie because the evidence pointed toward him, [and] that he wants to put the spotlight on Mr. Delgado and away from him." Delgado's trial attorney also acknowledged that had he been aware of the promise of a reduced charge in exchange for McGee's testimony, as well as the advice from McGee's attorney to McGee that such cooperation ultimately could lead to a dismissal, he would have used that information to impeach McGee. Moreover, Delgado's trial attorney testified that although he had read the preliminary hearing transcript in preparation for trial, he did not pursue that potential line of impeachment because the prosecutor had assured him that no promises had been made. The prosecutor (a different assistant district attorney than the one who had handled pretrial and trial matters) questioned Delgado's trial attorney at the postconviction hearing:

Q: Now, in your questions of Mr. McGee during the course of the trial, your clear intent was to suggest to the jury that Mr. McGee's charge was reduced in exchange for his testimony, is that right?

A: Yes.

Q: And you felt that you were able to get that point across by bringing out the fact that Mr. McGee had been originally charged with first degree intentional homicide and that his charge was reduced substantially after he testified against Mr. Delgado at the preliminary hearing, right?[1]

A: Well, it was my desire to get that point across, yes.

Q: And do you feel that you had gotten that point across?

A: That's the point I made, yes.

Q: Okay.

A: But on the other hand, also when I questioned Mr. McGee, he said that there were no—that he wasn't promised anything, that was his answer, so there was, you know, some conflict but—between what Mr. McGee was saying and what I was trying to get across.

Q: Uh-huh. And you made—you didn't—you didn't feel that it would be appropriate for you to call [McGee's attorney] to the stand, did you, even though you had read those comments in the preliminary hearing transcript?

A: No.

Q: Okay. You didn't feel that that would be fruitful?

---

[1] At the trial, the court allowed Delgado's trial attorney to elicit McGee's testimony that the charge had been reduced, but did not allow any specification of the reduced charge or penalty.

747

A: Once [the prosecutor] told me there was no deals, I really didn't pursue it further.

Q: Did you feel that there might be some danger in calling [McGee's attorney] to ask him about the existence of any deals?

A: No, I didn't. That didn't come into consideration.

Q: Okay, so your decision—you made the decision not to call [McGee's attorney] because of [the prosecutor's] statement that there were no deals?

A: Right.

At the trial, although Delgado's attorney did elicit McGee's testimony conceding that he originally had been charged with the homicide but subsequently faced a lesser charge, counsel never exposed any *connection* between McGee's cooperation and the reduction of the charge.[2] Further, Delgado's trial attorney also did not expose the fact that McGee's bail had been reduced from $250,000 cash to a personal recognizance bond, resulting in his release from jail, in consideration for his cooperation and testimony. It is the connection between the State's consideration and McGee's *motivation* to testify, not the mere unexplained fact of a reduction in the charge or modification of the bail, that goes directly to McGee's credibility.

The significance of McGee's motivation to testify, and the connection between that motivation and McGee's credibility, was important to the prosecution. Were there any doubt in this regard, Delgado's trial

---

[2] The reduced charge, aiding a felon, carried a maximum prison sentence of two years. *See* §§ 946.47 & 939.50(3)(e), STATS. That reduced charge was ultimately dismissed and McGee never was prosecuted further for any offense related to the Quesada murder.

attorney's concluding cross examination and the trial prosecutor's immediate re-direct examination punctuated the point:

[Delgado's attorney]: So you're telling us, Mr. McGee, that nothing was promised to you in return for your cooperating and testifying in this case?

A: Correct.

[Delgado's attorney]: I have no other questions.

THE COURT: Redirect, Mr. [prosecutor]?

[The prosecutor]: So why are you testifying?

A: Because I feel it's the truth, I feel telling the truth is the thing to do.

Thus, in closing argument, the prosecutor specifically referred to the importance of assessing McGee's credibility in terms of "the possible motives for falsifying." The jury, however, never knew key components of what McGee's motivation might have been.

■■■■
The Sixth Amendment right to counsel guaranteed criminal defendants is the right to the effective assistance of counsel. *McCann v. Richardson*, 397 U.S. 759, 771 (1970). To establish the denial of effective assistance of counsel at trial, a defendant must prove both that counsel's performance was deficient and that such deficient performance prejudiced his defense. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845, 847-848 (1990); *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

■■■■
Review of an ineffective assistance of counsel claim involves a mixed question of law and fact. *Johnson*, 153 Wis. 2d at 127, 449 N.W.2d at 848. The trial court's

factual findings from the postconviction motion will not be disturbed unless clearly erroneous. *Id.* The legal conclusions of whether the performance was deficient and prejudicial based on those factual findings, however, are questions of law independently reviewed by this court. *Id.* at 128, 449 N.W.2d at 848.

To establish deficient performance, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 127, 449 N.W.2d at 847. Trial and appellate court reviews of counsel's performance remain highly deferential. *Id.* To demonstrate deficient performance, a defendant bears the burden to overcome a strong presumption that counsel acted reasonably and within professional norms. *Id.* at 127, 449 N.W.2d at 847-848. Further, counsel's strategies and performance must be reviewed from counsel's perspective at the time of trial. *Id.*

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (Cite omitted). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.

*State v. Ludwig*, 124 Wis. 2d 600, 608, 369 N.W.2d 722, 725 (1985) (quoting *Strickland*, 466 U.S. at 689).

Should a defendant establish counsel's deficient performance, he or she next must prove prejudice. *Johnson*, 153 Wis. 2d at 129, 449 N.W.2d at 848.

Prejudice has occurred when counsel's deficient performance was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To demonstrate prejudice, a defendant must show a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. *Johnson*, 153 Wis. 2d at 129, 449 N.W.2d at 848. A reasonable probability is one sufficient to undermine confidence in the outcome of the trial. *Id.*

■ The trial court concluded that Delgado's trial counsel was not ineffective. The trial court reasoned that because McGee and the State had not finalized their specific agreement, they had made no deal. On appeal, the State maintains that same theme. We conclude, however, that the undisputed facts establish that McGee and the State had an agreement. The fact that all the specific terms had not been finalized did not vitiate the significance of the agreement in relation to McGee's credibility at Delgado's trial.[3]

Whether the complete deal had been finalized was of no legal consequence given the undisputed facts of the agreement and given *McGee's understanding* of the assurances he had received. It is McGee's understanding that connects to his motivation to testify, thus forming the basis for impeachment. It is McGee's understanding, further based on the realization of the reduced charge and release from pretrial custody, that render his denials of any promises additionally damaging to his credibility.

---

[3] Indeed, the jury could have decided to attach even greater weight to a *non-finalized* agreement. Logically, the jury could have surmised that McGee would have believed that the better his testimony for the State, the better the final deal for him.

Thus, regardless of the ultimate terms of the agreement with the State, McGee's understanding and expectation of consideration established the " 'prototypical form of bias.' " *See State v. Lindh*, 161 Wis. 2d 324, 353-357, 468 N.W.2d 168, 178-180 (1991) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673 (1986)). The supreme court explained that a prototypical form of bias arises in "a situation in which a witness might have or realistically perceive an interest in testifying so as to favor the prosecution . . . in exchange for reduction in charges or sentence." *Lindh*, 161 Wis. 2d at 354, 468 N.W.2d at 178. A prototypical form of bias is "evident" where charges are pending against a witness. *Id.* at 355, 468 N.W.2d at 179. As the supreme court further explained:

> In cases where there exists a prototypical form of bias, the possibility of bias, motive and interest of the witness is particularly distinct and immediate. The witness has an ongoing, dual relationship with the prosecutory actors. On the one hand, the witness as such is being of some service to the prosecution by giving his testimony; on the other hand, his status with respect to the same prosecution is "vulnerable." Criminal process of some sort against the witness, even if only at its initial stages, is a reality. Usually, it is being carried out by the prosecuting attorneys who are depending on his services as a witness; at the very least, it is being carried out in the same jurisdiction as the one in which the witness is offering his testimony. Under such circumstances, there usually is a reasonable inference that the witness is or considers himself to be in a position of being effectively more or less "vulnerable" to factors that could influence his testimony. The witness's acts, relationship or situation with respect to the state might be likely to produce

at least a strong suspicion of bias, motive and intent in the eyes of a jury. A jury might reasonably have found the evidence "furnished the witness a motive for favoring the prosecution in his testimony."

*Id.* at 356-357, 468 N.W.2d at 179-180 (citation omitted).

The fact that McGee and the State had not finalized their deal does not matter. The " 'particular importance of searching cross-examination of witnesses who have substantial incentive to cooperate with the prosecution'. . . does not depend upon whether or not some deal in fact exists between the witness and the Government." *United States v. Lankford*, 955 F.2d 1545, 1548-1549 (11th Cir. 1992) (trial court erred in refusing to allow cross-examination of government's chief witness to expose witness's possible motive to cooperate stemming from arrest of sons in unrelated case, despite the fact that witness and government had made no deal). Further, "[w]hat tells, of course, is not the actual existence of a deal but the witness' belief or disbelief that a deal exists." *United States v. Onori*, 535 F.2d 938, 945 (5th Cir. 1976); *see also Hoover v. State of Maryland*, 714 F.2d 301, 305 (4th Cir. 1983) ("The vital question" is not what government understands terms of agreement to be, but rather "what the *witness* understands he or she will receive, for it is this understanding which is of probative value on the issue of bias.").[4]

---

[4] *Hoover v. State of Maryland*, 714 F.2d 301 (4th Cir. 1983), is particularly germane. In a prosecution for second-degree murder, Hoover's alleged accomplice was granted immunity and became the government's chief witness. *Id.* at 303. The jury was informed that the witness originally had been charged with the murder but had received immunity in return for testifying. The conviction was reversed, however, because the trial court

By the time of trial, Delgado's trial attorney was aware of two contradictory accounts of whether McGee had received any promises in exchange for his testimony against Delgado: the statements by McGee's attorney at the preliminary hearing explaining that but for the assurances he had received from the prosecutor he would not have allowed McGee to testify, and the trial prosecutor's statements that there had been no deals. Delgado's trial attorney knew that his theory of defense depended on the impeachment of McGee. Without further inquiry or investigation into the remarkable disclosure by McGee's attorney about McGee's misstatements at the preliminary hearing, Delgado's trial attorney accepted the prosecutor's pronouncement of McGee's "no deal" status.

We discern no conceivable basis on which Delgado's trial attorney would not have interviewed

---

abridged Hoover's right of confrontation when it prevented the defense from eliciting additional details of the agreement and "from developing *[the witness's] understanding* of what concrete benefits he would receive from the agreement." *Id.* at 303-306 (emphasis added).

It is in this regard that the dissent simply misses the point. The question is not whether a specific and finalized "deal was cut." The first question is whether the State provided consideration to McGee in exchange for his cooperation and testimony. The State did so and, on that point, there is no dispute. The next question is whether McGee understood that there was such an agreement. He did so and, on that point, there also is no dispute. The final question, therefore, is whether the State's consideration connected to McGee's motivation to testify and influenced what he said. That, of course, should have been for the jury to evaluate, based on a full and fair examination of nature, timing, and substance of McGee's non-finalized but undisputed agreements with the State.

McGee's defense counsel, called him as a witness, or impeached McGee through cross-examination based on the information from the preliminary hearing. Similarly, we see no reason why Delgado's trial attorney would not have exposed the fact that McGee's release, confirmed by the record of the bail hearing, was conditioned on his cooperation with the prosecution of Delgado. We conclude that trial counsel's failure to pursue these areas of potential impeachment was deficient. *See State v. Marty*, 137 Wis. 2d 352, 361-362, 404 N.W.2d 120, 124 (Ct. App. 1987) (where victim/witness's "credibility was vital," evidence that victim/witness "was lying . . . would have been viewed by an ordinarily prudent lawyer as essential").

Whether this deficiency was prejudicial depends on whether the failure to introduce such evidence raises "a probability sufficient to undermine confidence in the outcome." We conclude that it does. McGee's credibility was crucial. Although the jury learned that the charge against McGee had been reduced, the jury did not learn three critical things that it would have learned had Delgado's trial attorney pursued these areas of impeachment: (1) that McGee, in fact, had testified at the preliminary hearing because he had been promised a substantial reduction of the charge; (2) that McGee was testifying at the trial to fulfill his promise of cooperation in exchange for the reduction of the charge, possible dismissal, and release from pretrial custody; and (3) that McGee, at both the preliminary hearing and the trial, lied.

In this case, where the State's evidence rested so substantially on McGee's credibility, where his account varied substantially from Delgado's alleged confession, where two alibi witnesses testified for Delgado, where four witnesses testified that McGee admitted shooting

Quesada, and where McGee was found with the murder weapon and originally was charged as the other primary suspect in the murder, the failure to expose the promises to McGee and the failure to expose McGee's repeated denial of the promises undermine confidence in the outcome of this trial.[5] Accordingly, we reverse and remand for a new trial.

[5] We note a related issue bearing on McGee's credibility. Delgado has argued on appeal that his trial attorney also was ineffective for failing to object to the State's closing argument implying that McGee's credibility was enhanced because he "has really got death threats" resulting from his willingness to break the Spanish Cobra code and testify against a fellow gang member. As the assistant district attorney at the postconviction hearing conceded, however, "when [the prosecutor from the trial] made comments during his closing argument about death threats, I frankly didn't know what he was talking about." Indeed, there was absolutely no evidence of death threats and, as the State concedes on appeal, "[t]he trial prosecutor's comments about death threats, in closing, were perhaps hyperbolic."

Although we need not reach the issue of whether Delgado's trial attorney's failure to object to the trial prosecutor's unsupported reference to death threats in the closing argument constituted ineffective assistance, we have considered the parties' arguments on this issue to the extent that they provide further confirmation of the significance that each party attached to McGee's credibility. Thus, the unsupported reference to death threats adds to our concern that this jury ultimately did not have a full and unblemished opportunity to consider full and accurate evidence regarding McGee's credibility.

Although we do not reach Delgado's additional argument that he was denied due process by the trial prosecutor's failure to reveal or correct McGee's false testimony, see *Napue v. Illinois*, 360 U.S. 264, 269-272 (1959) (defendant denied due process when prosecutor obtains conviction with aid of evidence

*By the Court.*—Judgment and order reversed and cause remanded with directions.

WEDEMEYER, P.J. (*dissenting*). Delgado's claim of ineffective assistance succeeds or fails on the basis of the fact-finding process of the *Machner*[1] hearing. The trial court in this case made the following finding of fact: "[T]here is nothing in the record to show that an actual, quote, deal was cut, unquote." Contrary to the majority's conclusion on this point, I do not conclude this finding was clearly erroneous. Although there is

---

prosecutor knew or should have known to be false and new trial required when there is a reasonable likelihood that false testimony affected verdict), we recognize that our analysis of this appeal exposes the failure not only of Delgado's trial attorney, but of the trial prosecutor as well.

As the declaration from McGee's attorney at the preliminary hearing exemplified, attorneys are court officers who share the continuing responsibility to prevent misrepresentations from misleading a court. Thus, in this case, although our analysis focuses on the ineffective assistance of Delgado's trial attorney, we also acknowledge a prosecutor's responsibility for protecting a trial from misrepresentations that may require reversal.

Despite our critical comments regarding the performance of both trial attorneys in this case, we also note that, in other respects, the record shows their litigation to have been intelligent and thorough. The trial record suggests that this was a challenging case for both sides due, in part, to the difficulties that may attend cases involving gang violence. Our opportunity to study the record affords us the chance to scrutinize counsels' conduct, as indeed we must. In this case, however, we appreciate that what is clear on appeal may have seemed obscure to the attorneys in the midst of trial.

[1] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

evidence of some discussions between the prosecutor and McGee's attorney, there is no evidence that a deal was actually made. McGee's attorney's affidavit does not aver that a deal was made. The prosecutor's affidavit implicitly denies that a deal was made. There is evidence that the charges against McGee were dismissed for reasons other than a "deal" with the State. Therefore, I would uphold the trial court's finding that no "deal" was made.

Because the trial court's finding that no "deal" was made was not clearly erroneous, Delgado's trial counsel's performance was not deficient for failing to investigate the "deal" or for failing to introduce further evidence of a deal. Thus, there is no basis to conclude that Delgado received deficient assistance, and therefore, ineffective assistance of counsel. Accordingly, I respectfully dissent.