COURT OF APPEALS
DECISION
DATED AND FILED

December 21, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP774**

STATE OF WISCONSIN

Cir. Ct. No. 2010CF770

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

MYCHAEL R. HATCHER,

DEFENDANT-APPELLANT.

APPEAL from an order of the circuit court for Brown County: TAMMY JO HOCK, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Nashold, JJ.

Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).

¶1 PER CURIAM. Mychael Hatcher appeals from the denial of his WIS. STAT. § 974.06 (2019-20),[1] postconviction motion. We affirm.

¶2 The procedural background of this case is convoluted. An amended Information charged Hatcher with second-degree sexual assault of a person who was too intoxicated to give consent and whom he knew was incapable of giving consent, in violation of WIS. STAT. § 940.225(2)(cm). He was also charged with one count each of obstructing an officer and misdemeanor bail jumping. All counts were charged as repeaters.

¶3 The victim testified at trial that after a night of heavy drinking, she returned with Hatcher and his girlfriend, Lisa Ewald, to an apartment in De Pere. When they arrived, Ewald helped the victim inside and carried her upstairs to a spare bedroom. Around 2:00 or 3:00 a.m., the victim awoke to find Hatcher forcing his penis inside her vagina from behind. She testified she was too drunk to verbalize her lack of consent or to physically resist him as she passed in and out of consciousness.

¶4 The victim again awoke around 6:30 a.m. and immediately called a friend, who was drinking with the group the previous evening, to tell her that Hatcher had "raped" her. The friend immediately called Ewald, with whom

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

Hatcher was now sleeping in Ewald's bedroom, to relay what the victim had said. The victim also called law enforcement at the friend's urging. According to the victim, Ewald then came into the spare bedroom and apologized to the victim for what had happened. Ewald also met the victim at the hospital for a sexual assault examination.

¶5 When questioned by police at the scene, Hatcher gave a false name and denied having sex with the victim, because she was "so drunk" and "way too drunk." Hatcher later admitted having sex with the victim that night, but claimed it was consensual and after he gave her a glass of water and they had a brief conversation. Hatcher was the source of male DNA recovered from sperm inside the victim's vagina. A report estimated the victim's blood alcohol concentration to be between .143 and .233 percent at the time of the sexual assault, and between .183 and .333 percent at the time they left the bar.

¶6 The jury convicted Hatcher on all three counts. After sentencing, postconviction counsel was appointed for Hatcher, but counsel withdrew after preparing a no-merit report. Hatcher then retained a second postconviction attorney, who filed a motion for direct postconviction relief raising a variety of issues, including several challenges to trial counsel's effectiveness. The circuit court denied the motion after an evidentiary hearing, and it also denied a motion for reconsideration.

¶7      We subsequently affirmed the judgment of conviction, the denial of postconviction relief, and the denial of reconsideration. *See State v. Hatcher*, No. 2015AP297-CR, unpublished slip op. (WI App Aug. 16, 2016).  Our supreme court denied Hatcher's petition for review.

¶8      Hatcher then hired a third attorney to further pursue postconviction relief.  The attorney sent correspondence to the circuit court arguing that the State failed to disclose exculpatory documents, but the attorney's letter did not mention a cooperation agreement supposedly reached between the State and Ewald in exchange for her testimony at Hatcher's trial.  Nothing further came of this submission because Hatcher apparently fired this attorney and elected to represent himself.

¶9      Hatcher subsequently filed a pro se motion for collateral postconviction relief under WIS. STAT. § 974.06, seeking a new trial on various grounds, including a *Brady*[2] violation for the State's failure to disclose to him the purported cooperation agreement with Ewald.  Hatcher further argued that his postconviction attorneys were ineffective for not raising the *Brady* violation issue as a sufficient reason to excuse his failure to raise this issue on direct review.  *See State v. Romero-Georgana*, 2014 WI 83, ¶30, 360 Wis. 2d 522, 849 N.W.2d 668.

---

[2]  Referring to *Brady v. Maryland*, 373 U.S. 83 (1963).  The *Brady* rule is codified in the Wisconsin criminal discovery statute, WIS. STAT. § 971.23(1)(h).

Hatcher's third attorney then returned even though Hatcher was proceeding pro se. Although he took over the case, this attorney relied primarily on Hatcher's pro se motion, even adopting Hatcher's arguments in an amendment to Hatcher's pro se motion.

¶10 The circuit court conducted two exhaustive evidentiary hearings, and it made detailed findings of fact and credibility determinations before ruling that the State did not suppress evidence. The court found the State did not enter into a cooperation agreement with Ewald in exchange for her testimony at Hatcher's trial. In the alternative, the court held that even if there had been an unwritten cooperation agreement, any failure to disclose it before trial was harmless because disclosure would not have changed the outcome at trial. The court found that Ewald's testimony was, to a large extent, favorable to Hatcher, such that Hatcher would have had no incentive to impeach Ewald with a cooperation agreement. Further, the court noted the fact that Ewald was not an eyewitness to Hatcher's sexual assault of the victim.

¶11 As an initial matter, there is some confusion as to whether Hatcher's claim on appeal is one of ineffective assistance of counsel, or a stand-alone argument that the State denied him due process when it allegedly withheld exculpatory evidence. In the circuit court, Hatcher offered ineffective assistance as his sufficient reason for his failure to argue on direct review that the State denied him due process by not disclosing the cooperation agreement. *See*

5

*Romero-Georgana*, 360 Wis. 2d 522, ¶5. The State contends that Hatcher, in his briefs to this court, no longer offers ineffective assistance as the sufficient reason for not previously raising the issue—in fact, he offers no reason at all, sufficient or otherwise. The State argues that Hatcher has thereby abandoned his ineffective assistance challenge on appeal and that, left without an ineffective assistance claim, Hatcher no longer has a cognizable sufficient reason to excuse his failure to present his stand-alone due process challenge. The State asserts that this procedural defect is fatal to Hatcher's appeal. We need not decide this case on procedural grounds, however, because Hatcher's arguments fail on the merits.

¶12    The purported cooperation agreement had its genesis in charges Ewald herself faced for allegedly harboring a felon (Hatcher), encouraging a probation and parole violation (by Hatcher, while he was released on extended supervision), and obstructing a law enforcement officer. She and Hatcher were ordered not to have any contact with each other, but police learned that they had regular telephone contact in violation of the no-contact order. Ewald was thus also exposed to twenty-four potential felony bail jumping charges, but those counts were never filed.

¶13    Ewald's only plea offer from the State was a formal, written offer in an "offer memo" that was presented to Ewald and her attorney—i.e., the same offer that Ewald eventually accepted when she pleaded guilty and was sentenced. Pursuant to the offer memo, Ewald pleaded guilty to one count of encouraging a

probation or parole violation and one count of obstructing an officer. The count of harboring a felon was dismissed and read in. At her sentencing hearing, Ewald's trial attorney stated:

> As part of this agreement as well, there are bail jumpings that the State believes [it] can charge for having telephone contact with Mr. Hatcher, those will not be charged as long as she continues to cooperate in the prosecution of Mr. Hatcher with whatever information it is she may have.[3]

¶14 Ewald testified at Hatcher's postconviction hearing that she believed the "pending" bail jumping counts were "going to be dismissed as long as [she] was cooperating." Furthermore, Ewald testified that her testimony at Hatcher's trial would have been different had she not been offered a dismissal of the bail jumping counts. However, she did not elaborate on how or why it would have been different.

¶15 Hatcher argued in the circuit court that the foregoing evidence demonstrated the existence of a cooperation agreement with the State, by which Ewald testified against Hatcher. The court found, however, that no evidence had been produced "that reduced a meeting of the minds to a physical document which spelled out Hatcher's allegation." Furthermore, the court found that Hatcher had failed to produce any evidence—or even an argument—to establish when he

---

[3] The assistant district attorney who appeared at Ewald's sentencing hearing for the lead prosecutor (who had left several days earlier for military service) did not object to or correct Ewald's attorney.

believed such cooperation negotiations between the State and Ewald began. Without such evidence, the court found "it is difficult to assess whether a drastic change in the parties' bargaining positions occurred, presumably due to the revelation that Ewald may be able to assist the State in its prosecution of Hatcher." The court also found that "it does not appear there had been a meeting of the minds between the State and Ewald" at Ewald's sentencing hearing.

¶16 The circuit court stated that the "most important consideration in the court's decision on this issue" was the testimony of the lead prosecutor who had left for military service in the midst of Ewald's case. That prosecutor had testified: "I find it very, very hard to believe that I would make an agreement like that two days before leaving for over five months on military leave when I know I'm going to be dumping this case onto another prosecutor, for lack of a better term." The court noted, "[I]t was actually the fact that he would be leaving and passing the case onto another attorney that [the lead prosecutor] considered 'the biggest factor' suggesting to him that if there had been an offer to Ewald [as alleged by Hatcher], it would have been in writing." The prosecutor testified that he could not think of another instance when an agreement to testify was involved but was not reduced to writing.

¶17 The circuit court believed, too, that "if there had been a plea agreement along the lines alleged by Hatcher, the State would have evidenced its assent thereto in writing—such as in an updated offer memo—and orally at

sentencing." Furthermore, the lead prosecutor was familiar with both Ewald and Hatcher, as he was the prosecutor assigned to both cases. The court found, "It is reasonable to believe … where [the lead prosecutor] was the prosecutor and made an offer to a defendant in one case to testify against the defendant in the other, there would have been some sort of memorialization in either or both files." The court found its conclusion all the more reasonable in light of the fact that the formal written plea offer Ewald eventually accepted was still in the file, thereby making it all the more likely that a written offer to Ewald as alleged by Hatcher would have still been in the file just as the original memo offer was.

¶18 The circuit court further found that failure to reduce such valuable consideration to writing "does not make sense when viewed from either party's perspective." Without the terms of the State's promise in writing, "there would be no way to truly measure either party's performance." As the court found, "If Ewald's testimony was so valuable to the State … that it would decline to charge Ewald with the bail jumping counts or it would offer her leniency, it does not make sense that evidence of the State's intent would be found only in a few noncommittal lines" from a hearing. The court specifically rejected Hatcher's contention that a "handshake" offer existed. The court found, "It is not believable that an offer would have been made and not documented in Ewald's file." Thus, the court concluded "there was no due process requirement upon the State to

9

disclose to Hatcher's trial counsel what amounted to nothing more than mere negotiations."

¶19    The circuit court's findings of fact and credibility determinations render Hatcher's current challenges meritless.  Suppression by the prosecution of evidence favorable to the accused violates due process when the evidence is favorable and material to guilt or punishment.  ***Brady***, 373 U.S. at 87.  Here, the court found that the State did not suppress a cooperation agreement that never existed.  The agreement could be favorable and material only if it existed.  The court's finding that it did not exist is not clearly erroneous.

¶20    Indeed, we do not discern Hatcher to vigorously challenge the circuit court's findings as clearly erroneous.  Rather, Hatcher argues "[t]he fact that there was no finalized, documented proof of an offer by the [S]tate to Ewald for her testimony is not dispositive."  Citing ***State v. Delgado***, 194 Wis. 2d 737, 535 N.W.2d 450 (Ct. App. 1995), Hatcher asserts that "Ewald's expectation of consideration established the prototypical form of bias."

¶21    Hatcher argues "[t]he fact that Ewald and the [S]tate had not finalized their agreement does not matter."  He contends the "particular importance of the cross-examination of witnesses who have substantial incentive to cooperate with the prosecution does not depend on whether or not some formal deal in fact existed between Ewald and the [S]tate."  Hatcher further insists that

but for Ewald's testimony, Hatcher would not have been convicted of the sexual assault charge. He argues that Ewald's testimony was "material [to] the element of intoxication and consent." Therefore, he contends the State should have disclosed that Ewald was testifying in exchange for consideration "so that her credibility could have been impeached as a bias[ed] witness for the State."

¶22 Hatcher fails to appreciate that the test for materiality is the same as the test for prejudice to prove an ineffective assistance of counsel claim—namely, the evidence is not material unless the failure to disclose it was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. *See State v. Wayerski*, 2019 WI 11, ¶36, 385 Wis. 2d 344, 922 N.W.2d 468. The circuit court found there was no reasonable probability of a different outcome had the purported cooperation agreement been disclosed to Hatcher and introduced into evidence.

¶23 Although Ewald testified in the State's case against Hatcher, to a large extent her testimony proved to be unfavorable to the State and helpful to Hatcher's defense. Ewald provided testimony on direct examination at trial that the victim was "buzzed" but functional when they left the bar. Ewald denied that the victim fell asleep in the car on the way home. Rather, she said the victim sang along to music on the way home. Although Ewald helped the victim upstairs to the bedroom, Ewald testified the victim was able to move and talk on her own, and they engaged in a conversation in the bedroom before Ewald said goodnight and

11

went to her own bedroom. Ewald also testified that the victim was upset because she had broken up with her boyfriend earlier that evening.

¶24 Ewald's testimony ultimately did not help Hatcher because it was so easily and soundly impeached by her own statements to police, which corroborated the victim's testimony that the victim was extremely drunk and had passed out. In her earlier statement to police, Ewald said that the victim was "very intoxicated" when they left the bar, she had to help the victim into the car, the victim fell asleep on the ride home, and Ewald had to carry her up the stairs and into the spare bedroom. Also, Ewald did not tell the police about the alleged conversation with the victim in the bedroom.[4]

¶25 Hatcher's own testimony was similar to Ewald's in some respects, which further shows that Ewald's testimony was favorable to the defense. Hatcher testified they were asked to leave the bar, but the victim was not stumbling or slurring her speech when they left.

¶26 *Delgado* also provides Hatcher no assistance. That case involved evidence that rested so substantially on the witness's credibility that the failure to expose the promises to the witness, and the failure to expose his repeated denial of the promises, undermined confidence in the outcome of the trial. *Delgado*, 194

---

[4] Ewald further admitted that Hatcher was her boyfriend, which tended to show bias in his favor. She was also impeached with her four criminal convictions.

Wis. 2d at 755-56. Therefore, the deficient performance in that case was so serious that it deprived the defendant of a fair trial. *Id.* at 751.

¶27 As the circuit court properly found, there is no reasonable probability that failure to disclose any purported promises to Ewald would have undermined confidence in the outcome of Hatcher's trial. Hatcher's postconviction attorneys were, therefore, not ineffective for failing to present a meritless argument.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.