

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2003

# USA v. Chandler

Precedential or Non-Precedential: Precedential

Docket 01-2572

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation
"USA v. Chandler" (2003). *2003 Decisions.* Paper 593.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/593

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed April 14, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-2572

UNITED STATES OF AMERICA,

v.

LINDA LEE CHANDLER,

*Appellant.*

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. No. 00-CR-00169
District Judge: Honorable Donetta W. Ambrose

Argued May 2, 2002

BEFORE: ROTH and STAPLETON, *Circuit Judges,* and
POLLAK,* *District Judge*

(Filed: April 14, 2003)

---

* Honorable Louis H. Pollak, District Judge for the United States
District Court for the Eastern District of Pennsylvania, sitting by
designation.

Troy Rivetti (argued)
Bonnie R. Schlueter
Office of United States Attorney
633 United States Post Office
 & Courthouse
Pittsburgh, PA 15219

*Counsel for the Appellee*

Warren A. Brown (argued)
200 E. Lexington Street, Suite 120
Baltimore, MD 21202

Joseph K. Williams, III
1442 Pennsylvania Avenue
Pittsburgh PA, 15233

*Counsel for the Appellant*

## OPINION OF THE COURT

POLLAK, *District Judge*:

Linda Lee Chandler was convicted of participation in a drug-distribution conspiracy. On appeal, she challenges several evidentiary rulings entered by the District Court. Because we agree with Chandler that the constraints placed by the District Court upon her cross-examination of two government witnesses unduly restricted her ability to defend herself at trial, we reverse and remand for a new trial.

## I

On September 13, 2000, Linda Lee Chandler ("Chandler") and three co-conspirators—Frederick White, Teodora Yearwood, and William Yearwood—were charged in a five-count indictment, the first count of which alleged that, from 1995 to 1998, all four co-conspirators had conspired, in violation of 21 U.S.C. § 846, to distribute and possess with intent to distribute more than five kilograms of cocaine. The

third count of the indictment also charged Chandler with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i). (The second, fourth, and fifth counts charged White, Teodora Yearwood, and William Yearwood, respectively, with money laundering.) The government alleged that, beginning in 1995, Chandler became part of a drug organization headed by a man named William Baker, and assisted Baker's organization by buying, transporting, storing, and selling cocaine.

Frederick White, Teodora Yearwood, and William Yearwood pled guilty, but Chandler proceeded to trial. A number of the government's witnesses had been members of the alleged conspiracy. They included William Baker, Sly Sylvester (a drug dealer allegedly supplied by William Baker), and Kathleen Yearwood (allegedly a supplier of cocaine to the group), together with two of the persons named as co-conspirators in Chandler's indictment— Frederick White (Chandler's boy-friend) and William Yearwood (Kathleen's father, and an alleged drug courier).[1] Another government witness, Annette Yearwood (Kathleen's sister), observed but did not participate in illegal activities. Through other witnesses, the government introduced testimony regarding surveillance of Chandler, her financial history, and her contacts with other members of the conspiracy. The jury convicted Chandler of the drug trafficking charge but acquitted her of the money laundering charge. She was sentenced to 121 months of imprisonment.

## II

Chandler presents three issues on appeal. The first concerns the District Court's admission into evidence of testimony and documents relating to Chandler's financial history, including her non-filing of tax returns. We review this ruling for abuse of discretion. *See United States v. Casoni*, 950 F.2d 893, 902 (3d Cir. 1991). For reasons explained below, we do not find that the District Court abused its discretion in admitting that evidence. The

---

1. Teodora Yearwood, who was the third co-conspirator indicted along with Chandler, did not appear as a witness in Chandler's trial.

second issue concerns limitations imposed by the District Court upon the scope of cross-examination of government witnesses. We review the imposition of those limitations for abuse of discretion. *See United States v. Ellis*, 156 F.3d 493, 498 (3d Cir. 1998). As explained below, we find that these limitations did constitute an abuse of discretion, and that the error was not harmless. We therefore remand this case for a new trial. In light of our resolution of this second issue, we do not find it necessary to resolve the third issue Chandler has presented—namely, whether the District Court erred in refusing to grant a mistrial after a government witness disclosed to the jury information asserted to be inadmissible as evidence, and prejudicial to Chandler.

## A

Chandler contends that the District Court erred when it admitted her bank records, her 1996 tax return, and testimony regarding her failure to file tax returns for the years 1997 and 1998. When the government presented a witness who was to testify to these matters, the following sidebar took place:

THE COURT: You want to ask him about tax returns?

MR. RIVETTI: Yes, we need a Court order to disclose them even to defense counsel. They have not been turned over.

THE COURT: I know you want to show income, but are you going to be able to show expenditures through this witness?

MR. RIVETTI: This witness, part of the investigation was the subpoenaing of the Defendant's bank records, which show repeated cash deposits. There is a number of cash deposits over $500.

THE COURT: Okay. Let's hear what your objection is.

MR. SCORATOW: First of all, the high prejudicial nature, we have a witness who will come in and testify he gave her the money, it is perfectly legal, it is loans. He also is an attorney and he does taxes, he looked over her taxes and he would tell her when she earned enough and when she didn't earn enough to pay income taxes. The highly prejudicial nature she doesn't have tax returns, they can show her income coming in, they have her bank accounts to try to do that and show this is the money she had from Mr. Baker. The mere fact that she filed returns or not, if those were gifts or otherwise not properly filed, unless they can come in and they're saying this is income tax fraud, which she's not charged with, it is the nature of another crime, it proves nothing, it's speculative, especially when they know we have Mr. Massung who is going to testify to where she got the money.

MR. RIVETTI: Your Honor, the case law is clear that unexplained income is probative as to whether or not the Defendant is involved in drug trafficking.

THE COURT: Right. What he is saying is why can't you show her bank records?

MR. SCORATOW: That's right, they can't.

MR. RIVETTI: The defense has said—in fact, during his opening statement he said that she cut hair, that she had real income. I think that the tax returns rebut that inference. First of all, no tax returns—

THE COURT: I am going to allow them. I think it's relevant and I think the case law I looked at supports it. I will sign it now. The objection of Defendant is noted.

In support of Chandler's contention that the trial court committed reversible error in admitting various items of financial information, Chandler relies on the Sixth Circuit's decision in *United States v. Carter*, 969 F.2d 197 (6th Cir. 1992). In *Carter*, the court reviewed a district court's ruling admitting evidence, over the defendant's objection, that the defendant had spent three thousand dollars on home appliances over a two-year period in 1989 and 1990, and had not filed tax returns for the years 1985 through 1990. The Sixth Circuit concluded that the district court had "abused its discretion by allowing the government to use a plethora of irrelevant financial information." Neither "the fact that Carter purchased a few appliances over a two-year period," nor her failure to file tax returns, the court found, was "probative on the issue of whether Carter engaged in a cocaine transaction on December 1, 1989," the crime with which she was charged. *Id.* at 200, 201.

Chandler contends that her tax information, as well as bank records showing over $8,200 in cash deposits over a six-month period in 1996 and 1997, likewise were "not probative of any issue in the case." Further, she argues that the admission of the tax return evidence was "highly prejudicial," presumably because a jury might have inferred from her failure to file returns in 1997 and 1998 that she had committed tax fraud.

There exists considerable appellate support for the admission in evidence, in drug-trafficking cases, of financial information of the sort admitted in Chandler's trial. "In a narcotics prosecution, it is well established that the government may introduce evidence of cash purchases coupled with tax evidence tending to show that a defendant had no legitimate source of cash." *United States v. Prix*, 672 F.2d 1077, 1084 (2nd Cir. 1982). *See also United States v. Mitchell*, 733 F.2d 327 (4th Cir. 1984) (same); *United States v. Briscoe*, 896 F.2d 1476, 1500 (7th Cir. 1990) (holding that it is "well settled that in narcotics prosecutions, a

defendant's possession and expenditure of large sums of money, as well as his or her failure to file tax returns, are relevant to establish that the defendant lacked a legitimate source of income and that, in all probability, the reason for the failure to report this income is due to the defendant's participation in illegal activities").

Courts of appeals consistently have upheld the admissibility of such evidence when it reasonably supports the government's assertion that the defendant possessed substantial cash not obtained through legitimate means. In *United States v. Figueroa*, 976 F.2d 1446, 1455 (5th Cir. 1992), the Fifth Circuit concluded that evidence that the defendant had not filed tax returns "tended to make it less likely that the large bank deposits during these tax periods derived from legitimate sources." In *United States v. Trotter*, 889 F.2d 153, 155 (8th Cir. 1989), the Eighth Circuit similarly found that the defendant's "failure to file any tax returns was probative of net worth and therefore relevant to [the defendant's] claim that the money [recovered from his car] was not the product of drug distribution."

Nor does this general rule apply only when very large sums of otherwise unexplained cash are involved. In *Mitchell*, the Fourth Circuit rejected the defendant's argument that his failure to file tax returns was inadmissible when "the government's only evidence of Bennett's sudden accession of wealth was the purchase of a $4,000 motorcycle." *Mitchell*, 733 F.2d at 331. This argument, the court explained, "misses the point of the evidence." *Id.* The touchstone of the admissibility inquiry is not the amount of money in the defendant's possession, but whether defendant's failure to account for its source tends to support the government's claim that the money was obtained through illegitimate means. In other words, to the extent that a defendant's failure to file tax returns evidences a lack of legitimate income, that evidence, in combination with evidence that the defendant possesses a significant sum of cash, generally is admissible in support of the government's contention that the defendant obtained the cash through the distribution of narcotics.

The Sixth Circuit's rejection of such tax evidence in *Carter* represents a relatively narrowly drawn exception to

this rule. Far from questioning the general admissibility of tax evidence in narcotics prosecutions, the court held only that the defendant's modest $3,000 expenditure over a period of two years did not make it more likely that she had engaged in a single cocaine transaction during the period for which she had not filed tax returns.[2]

In the case at bar, the government introduced Chandler's tax history—particularly her 1996 return and evidence that she did not file for 1997 and 1998—to demonstrate that her legitimate income was insufficient to explain the more than $8,200 of cash deposits made to her account over a six-month period from 1996 to 1997. In reviewing the district court's evidentiary ruling, we inquire only whether it was within the court's discretion to find that Chandler's tax information tended to make it more likely that Chandler derived some of the money in her bank account from her involvement in the distribution of narcotics. It is difficult to see how the fact that Chandler reported no earned income during a period in which she made over $8,200 in cash deposits does not tend to support the government's position. Nor did the court's admission of such evidence preclude Chandler from introducing evidence to rebut the government's inference that she obtained the money through her participation in narcotics transactions. Moreover, even if we are to regard Chandler's non-filing of tax returns, in combination with her relatively modest cash

---

2. Further, it should be noted that it does not appear from the Sixth Circuit's opinion in *Carter* that the trial court in that case gave the jury any limiting instruction directing the jury's attention to the limited pertinence of the tax return evidence. In the case at bar, after Chandler testified on direct examination about her tax history, the District Court instructed:

> [T]his is not a tax case. The Defendant in this case, Ms. Chandler, is not charged with any violation fo the Internal Revenue Code. You are to consider the evidence provided by this witness only in relation to the charges filed against the Defendant, and that is a conspiracy to distribute cocaine and a money laundering charge. This is not a tax case, she is not charged with any violation of the Internal Revenue Code, and you should not consider the evidence in light of that. You should only consider it as it relates to the charges filed against her in this case.

deposits, as only marginally probative of whether Chandler was involved in a drug conspiracy, we cannot say that the District Court abused its discretion in admitting the evidence.

## B

The second issue Chandler raises on appeal concerns limits placed by the District Court upon Chandler's cross-examination of government witnesses. At trial, Chandler's attorney, Martin Scoratow, attempted to cross-examine Sylvester about the sentence reduction he had received, and to cross-examine Kathleen Yearwood about the reduction she hoped to receive, in exchange for their guilty pleas and cooperation. Mr. Scoratow sought to cast doubt on the reliability of Sylvester's and Yearwood's testimony by demonstrating to the jury that they had very compelling reasons to incriminate Chandler. Mr. Scoratow's efforts in this regard, while not wholly cut off, were substantially restricted. The question is whether the restrictions imposed by the District Court can fairly be regarded as within the due exercise of that court's discretion.

*Testimony of Sly Sylvester*

During the course of his direct testimony, Sylvester—who had been sentenced prior to Chandler's trial—acknowledged that he was testifying pursuant to a cooperation agreement between himself and the government. Sylvester said that he had agreed to plead guilty to charges of selling three ounces of cocaine, to cooperate with law enforcement agents, and actively to work with them to identify and apprehend William Baker, the alleged leader of the drug distribution enterprise.[3] In return, the government limited the charges against him to those associated with the three-ounce cocaine sale, despite the fact that he admitted to having dealt "about five kilos" of cocaine during the relevant time period. The government also moved at sentencing to reduce Sylvester's term of imprisonment for the three-ounce sale

---

3. Sylvester made phone calls to Baker that were recorded by the agents, wore a microphone during personal meetings with Baker, and purchased six ounces of cocaine from Baker at the direction of the agents.

below the otherwise applicable range. Sylvester explained to the jury that although "12- to 18-month[s] was the statutory time parameters" for the offense to which he had pleaded guilty, he had received only one month of house arrest and a term of probation. On cross-examination, Sylvester admitted that he could have been charged with trafficking in much larger quantities of cocaine:

Q: Did anyone explain to you what the penalties for five kilos is under the guidelines?

MR RIVETTI: Your Honor, I object to these questions regarding the penalties for five kilos.

THE COURT: Okay. Penalties should not be discussed in the case, I would agree.

MR. SCORATOW: All right.

Q: Did they ever—well, was it explained to you that it was much more serious, that the Government actually gave you a break by charging you this small amount?

A: That's a great question because they only had me on three ounces. That's what they said the terms of this would be 12 to 18. I am not so sure exactly of your question. Would you want me to say to you that the bigger you sell, the more you sell, the more penalty? Well, of course.

Q: Okay. At the time you sold that three ounces, you had been dealing for awhile, hadn't you?

A: Yes, sir.

Later, Sylvester admitted that he had gone to a drug treatment program at the government's request, even though he did not believe that he was addicted to cocaine.

When Mr. Scoratow asked if that meant Sylvester would "do anything" to reduce his jail time, however, Sylvester insisted that he would not lie. Mr. Scoratow also asked if Sylvester was only testifying against Chandler to avoid reneging on his agreement with the government:

Q: Let's talk about that agreement. The final person who put in that you're honest and truthful is sitting right here, Mr. Rivetti, isn't that correct?

A: I'm sorry?

Q: The person who put what we call that 5K motion in to Judge Ziegler was Mr. Rivetti right here?

A: Yes.

Q: So he's the arbitrator on if you're truthful or not, right?

A: Yes. I would believe so.

Q: So if you say what he wants, you're truthful?

A: Well—

Mr. Scoratow: No other questions.

A: We are also in a court of law, sir, and you can't perjure yourself no matter what sentence was put in front of you, no matter what you're supposed to say or do. And to me that's the bottom line.

*Testimony of Kathleen Yearwood*

Unlike Sylvester, Kathleen Yearwood had not been sentenced before Chandler's trial. On direct examination, Yearwood testified that she had pled guilty shortly before Chandler's trial to trafficking in from "15 to 50 kilos" of cocaine, and had agreed to assist the government in ongoing drug investigations by, inter alia, wearing a wire during meetings with drug dealers. In return, she hoped that the government would move for a reduced sentence

against her. In his cross-examination of Yearwood, Mr. Scoratow suggested that her testimony was influenced by her agreements with the government. For example, after intimating that co-conspirator Frederick White may have been more culpable than Chandler, Mr. Scoratow asked Yearwood:

Q: But [White] is not on trial, you want to talk about Linda Chandler, is that correct?

A: Right.

Q: Because you have an agreement, isn't that correct, and Mr. Rivetti is going to, you hope, put in a motion to cut your time?

A: Yes.

. . .

Q: Now you want to help yourself and help—because you are in serious trouble. You were dealing in multikilos. Yes or no?

A: I'm 50. No more than 50.

Q: No more than 50 in this. But do you think you dealt more than 50?

A: No, I don't think so.

. . .

Q: How many lie detector tests did the Government put you on?

A: None, but they can put me on them.

Q: Isn't that in your plea agreement letter?

A: Yes, it is.

Q: But they haven't, and it's Mr. Rivetti who is going to write that letter to this Judge to say that you're honest and forthright, so you are going to

|  |  |
|---|---|
|  | talk about Linda Chandler, is that correct? |
| A: | No. |
| Q: | That's what you are here for today, to talk about Linda Chandler? |
| A: | No, I'm here to tell the truth. |
| . . . |  |
| Q: | And you know that you're here, you're facing a heavy sentence— what did your attorney, Mr. Riester, tell you you're facing? |
| MR. RIVETTI: | Your honor, again I object to discussing the penalties here. |
| THE COURT: | The objection is sustained. I think the point's been made that she knows by testifying she might get a reduction. |
| MR. SCORATOW: | Okay. No other questions. |

Chandler contends that, by barring defense counsel from cross-examining Sylvester and Kathleen Yearwood about the specific benefits they had received or hoped to receive in exchange for their testimony, the District Court deprived her of her Sixth Amendment right of confrontation. Principles enunciated by the Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986) guide our inquiry:

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965), "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S., at 315, 94 S. Ct., at 1110. Indeed, " '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " *Id.*, at 315-316, 94

S. Ct., at 1110 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)). Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis, supra*, at 316-317, 94 S. Ct., at 1110 (citing *Greene v. McElroy*, 360 U.S. 474, 496 79 S. Ct. 1400, 1413, 3 L. Ed.2d 1377 (1959)). It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Id.* at 678-79.

Governed by these principles, our review of the District Court's decision to truncate Chandler's cross-examination of Sylvester and Kathleen Yearwood proceeds in two stages: First, we must determine whether that ruling significantly inhibited Chandler's effective exercise of her right to inquire into either witness's "motivation in testifying"; and second, if the District Court's ruling did significantly inhibit Chandler's exercise of that right, whether the constraints it imposed on the scope of Chandler's cross-examination fell within those "reasonable limits" which a trial court, in due exercise of its discretion, has authority to establish.

**1**

In *Van Arsdall*, the state trial court had barred defense counsel from cross-examining a prosecution witness about the state's agreement to dismiss the witness's pending drunk-driving charge in exchange for his testimony against the defendant. The Supreme Court held that by cutting off all inquiry into "an event . . . that a jury might reasonably have found furnished the witness a motive for favoring the

prosecution in his testimony," the trial court's ruling deprived the defendant of his right to cross-examination secured by the Confrontation Clause. *Van Arsdall*, 475 U.S. at 680. Confrontation Clause claims, the Court elaborated, should be considered in relation to the potential effect of the foreclosed cross-examination on the jury's evaluation of a particular witness. Under the circumstances presented in *Van Arsdall*, "a reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of inquiry." *Id.* at 680.

Following *Van Arsdall*, circuit courts generally have agreed that "[w]hether a trial court has abused its discretion in limiting the cross-examination of a witness for bias depends on 'whether the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivation of the witnesses.'" *Brown v. Powell*, 975 F.2d 1, 4 (4th Cir. 1992) (quoting *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir. 1982)). *See also United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995) (adopting the "discriminating appraisal" formulation); *United States v. Graham*, 83 F.3d 1466, 1475 (D.C. Cir. 1996) (same); *United States v. Salameh*, 152 F.3d 88, 131 (2nd Cir. 1998) (same); *United States v. Ward*, 211 F.3d 356, 363 (7th Cir. 2000) (same); *United States v. Turner*, 198 F.3d 425, 429 (4th Cir. 1999) (To prohibit the cross-examination of a prosecution witness "on relevant evidence of bias and motive may violate the Confrontation Clause, if the jury is precluded from hearing evidence from which it could appropriately draw adverse inferences on the witness's credibility.") With respect to the cross-examination of cooperating witnesses who expect to obtain, or have obtained, a benefit from the government in exchange for their testimony, the "critical question . . . is whether the defendant is allowed an opportunity to examine a witness [sic] 'subjective understanding of his bargain with the government,' 'for it is this understanding which is of probative value on the issue of bias.'" *United States v. Ambers*, 85 F.3d 173, 176 (4th Cir. 1996) (quoting *Hoover v. State of Maryland*, 714 F.2d 301, 305, 306 (4th Cir. 1983)).

Uncertainty remains, however, over whether the Confrontation Clause guarantees to defendants the opportunity to cross-examine their alleged former co-conspirators-turned-prosecution-witnesses about the specific penalty reduction that they believed they would obtain, or that they did obtain, through their cooperation. Some courts of appeals have suggested that a trial court can secure to a defendant the "minimal constitutional threshold level of inquiry," *Luciano-Mosquera*, 63 F.3d at 1153, by permitting her to inquire whether a prosecution witness has received some type of benefit from the government in exchange for her testimony, even while precluding the jury from learning the "actual number of years" a witness believes she would have faced absent her cooperation. *United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997). The First Circuit's analysis in *Brown v. Powell* captures this position. In that case, a prosecution witness who originally had been charged, as a co-conspirator with the defendant, with first degree murder (carrying a maximum sentence of life without parole) entered into an agreement with the government under which, in exchange for his testimony against the defendant, he was allowed to plead guilty to manslaughter (carrying a sentence of fifteen to thirty years). The trial court prohibited the defense from asking the witness about his understanding of the maximum penalty for first degree murder—that is, the penalty he avoided through his cooperation—and permitted only testimony that the witness's sentence of fifteen to thirty years reflected a reduction. 975 F.2d at 4. Upholding the ruling of the trial court, the First Circuit wrote:

> The issue here is whether the trial court abused its discretion and committed constitutional error when it prevented the jury from hearing the potential penalty Warner [the witness/co-conspirator] avoided by pleading out of a first-degree murder charge. . . . The jury at petitioner's trial was clearly given sufficient information from which it could conclude that . . . the accomplice . . . had a substantial motivation to testify against petitioner and lie. . . . [T]he jury could have inferred that by pleading guilty to manslaughter and receiving a sentence of 15 to 30 years, Warner had avoided a significantly harsher penalty than if he had

> been tried and convicted . . . . The jury had more than sufficient information to conclude that Warner had a strong incentive to lie in order to receive a lesser sentence.

*Id.* at 5.

In contrast, other appellate courts have held that the Confrontation Clause guarantees to defendants the right to inform the jury not only that a witness/co-conspirator received or might receive prosecutorial leniency in exchange for his testimony, but also the "concrete details of the agreement [the witness] made with the government." *Hoover*, 714 F.2d at 303. In *Hoover*, an accomplice-turned-government-witness revealed during direct examination that he had received a "grant of immunity from prosecution" for murder in exchange for his testimony against a murder defendant. *Id.* When defense counsel repeatedly sought to inquire on cross-examination whether, as a result of his agreement with the government, the witness also expected the prosecutor to intervene on his behalf in other, apparently unrelated, pending criminal matters, the trial judge upheld the prosecutor's objections. The Fourth Circuit concluded that the trial court's "sustained and effective refusal to permit inquiry into [the witness's] subjective understanding of his bargain with the government stepped beyond the constitutional bounds of the trial court's discretion, and abridged the fundamental right to confront adverse witnesses secured to [the defendant] by the fourteenth amendment." *Id.* at 306. The court explained:

> The trial judge may limit such cross-examination only to preserve the witness' constitutional immunity from self-incrimination, to prevent attempts to harass, humiliate or annoy him, or where the information sought might endanger the witness' personal safety. When such factors are not present, substantial limitations on the attempts of a defendant to undermine as biased a witness' testimony constitute constitutional error.
>
> . . .

> The trial judge's traditional discretion to control the limits of cross-examination cannot be exercised until the constitutionally required threshold level of inquiry has been afforded the defendant. Moreover, any exercise of discretion once that threshold is reached must be informed by the utmost caution and solicitude for the defendant's Sixth Amendment rights.

*Id.* For the *Hoover* court, in other words, even informing the jury that a witness had received immunity from prosecution from murder in exchange for his testimony fell short of satisfying the "constitutionally required threshold of inquiry" sufficient for the jury to evaluate that witness's potential bias and motive to lie. *See also United States v. Tracey*, 675 F.2d 433, 438 (1st Cir. 1982) ("Especially where the witness is an accomplice of the defendant or may have some other substantial reason to cooperate with the government, the defendant should be permitted wide latitude in the search for the witness' bias."); *Burr v. Sullivan*, 618 F.2d 583, 587 (9th Cir. 1980) (same).

The circumstances of the present case do not require us to resolve whether the Confrontation Clause entitles a defendant categorically to inquire into the "concrete terms" of a cooperating witness's agreement with the government, including the specific sentence that witness may have avoided through his cooperation. Rather, we need only decide whether, if the trial court had not prohibited Chandler from cross-examining Sylvester and Kathleen Yearwood with respect to the *magnitude* of the sentence reduction they believed they had earned, or would earn, through their testimony, the jury might have "received a significantly different impression of [their] credibility." *Van Arsdall*, 475 U.S. at 680.

Sly Sylvester testified on direct examination to having sold roughly five kilograms of cocaine. Under § 2D.1(c)(5) of the 2001 Sentencing Guidelines, the base offense level of a defendant convicted of trafficking in "[a]t least 3.5 KG but less than 5 KG of Cocaine," is 30, which translates into a prison sentence of between 97 and 121 months. Sylvester testified that, under his agreement with the government, he was permitted to plead guilty to selling only three ounces of cocaine, a base level offense of 16, for which he was subject

to 21 to 27 months in prison under the Guidelines. (The range to which Sylvester referred during cross-examination —12 to 18 months—presumably reflected a three-point reduction he had received for acceptance of responsibility and timely notification of his intent to plead guilty.) On cross-examination, Sylvester further acknowledged that, pursuant to his plea agreement, the government had filed a § 5K.1.1 motion urging a downward departure, the eventual result of which was that Sylvester was sentenced to one month of house arrest, plus probation.

Kathleen Yearwood testified that she had pled guilty to trafficking in from "15 to 50 kilos" of cocaine, an offense which, under § 2D.1.1(c)(3) of the Guidelines, yields a base offense level of 34. This means that Yearwood was subject to a sentence of between 151 and 188 months. Before the trial judge precluded defense counsel from inquiring into the specifics of her hoped-for benefit, Yearwood testified that she expected the government to move for a downward departure in exchange for her cooperation.

In light of these facts, we have little difficulty concluding that a reasonable jury could have "reached a significantly different impression" of Sylvester's and Yearwood's credibility had it been apprised of the enormous magnitude of their stake in testifying against Chandler. With respect to Sylvester, the jury learned only that he pled guilty to an offense carrying a sentence of between 12 and 18 months, that he could have been charged with a greater offense, and that he received only one month of house arrest, plus probation. The jury would have had little reason to infer from that information that Sylvester's cooperation with the government might have meant the difference between more than eight years in prison, on the one hand, and the modest sentence he in fact received, on the other. The limited nature of Sylvester's acknowledgment that he had benefitted from his cooperation made that acknowledgment insufficient for a jury to appreciate the strength of his incentive to provide testimony that was satisfactory to the prosecution. Similarly, if Yearwood, facing a sentence under the Guidelines of upwards of twelve years, anticipated a benefit equal to even a fraction of Sylvester's proportionate penalty reduction, her mere acknowledgment that she

hoped that the government would move for a lesser sentence did not adequately enable a jury to evaluate her motive to cooperate.

A criminal defendant "states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' " *Van Arsdall*, 475 U.S. at 680 (citing *Davis v. Alaska*, 415 U.S. 308, 318 (1974). Chandler has made just such a showing. In *Van Arsdall*, moreover, the Supreme Court found that the trial court's foreclosure of inquiry into a relatively modest benefit —dismissal of a pending drunk-driving charge—was sufficient to support the conclusion that the court had withheld information necessary for the jury to make a "discriminating appraisal" of the witness's "possible biases and motivation." Sylvester received a benefit of far greater magnitude through his cooperation. Yearwood presumably hoped for similar treatment. For these reasons, we conclude that Chandler was barred from cross-examining Sylvester and Yearwood about facts which would have borne directly on the jury's consideration of the weight, if not the fact, of their motive to testify as they did—facts, that is, which would have underscored dramatically their interest in satisfying the government's expectations of their testimony.

**2**

Having found that the District Court's curtailment of Chandler's inquiry into the specifics of Sylvester's and Yearwood's agreements with the government significantly curtailed Chandler's ability to inquire into two key government witnesses' "motivation for testifying," we now turn to the question of whether that ruling nevertheless fell within the District Court's discretion to impose "reasonable limits" on a defendant's right of cross-examination. The government contends that its asserted interest in restricting Chandler's inquiry—its desire to prevent the jury from inferring the sentence to which *the defendant* could be exposed were she found guilty—warranted the District

Court's ruling limiting cross-examination. While we appreciate the government's interest in withholding information that potentially could induce a jury to "nullify" the federal law that Chandler was alleged to have violated, we find that such an interest is outweighed by Chandler's constitutional right to confront Sylvester and Yearwood.

The Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308 (1974), governs our analysis. In *Davis*, the Court reviewed a state trial judge's ruling prohibiting the defendant from cross-examining a key prosecution witness about his status as a juvenile probationer. Defense counsel sought to reveal that "at the same time that Green [the witness] was assisting the police in identifying petitioner he was on probation for burglary," with the intention of arguing that the witness was testifying both "out of fear or concern of possible jeopardy to his probation," and because he was a potential suspect, *Davis*, 415 U.S. at 311. The trial court foreclosed the inquiry. The prosecution maintained that the ruling was warranted because the state's "important interest in protecting the anonymity of juvenile offenders . . . outweighs any competing interest this petitioner might have in cross-examining [the witness] about his being on probation." *Id.* at 319.

The Court, speaking through Chief Justice Burger, expressly rejected that argument, announcing that "the right of confrontation is paramount to the State's policy of protecting a juvenile offender." *Id.* Whatever harm is done to the interests of the witness or the state, the Court explained, "is outweighed by petitioner's right to probe into the influence of possible bias in the testimony of a crucial identification witness," and for that reason "must fall before the right of petitioner to seek out the truth in the process of defending himself." *Id.* The state's asserted interest, the Court concluded, "cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320.

We conclude that, while the government had a valid interest in keeping from the jury information from which it might infer Chandler's prospective sentence were she to be convicted, that interest did not trump Chandler's entitlement under the Confrontation Clause. That interest,

like the state's interest in protecting the anonymity of juvenile offenders, had to yield to Chandler's constitutional right to probe the "possible biases, prejudices, or ulterior motives of the witnesses" against her. *Id.* at 316. We therefore decline to adopt the reasoning of the cases relied on by the government, *see Luciano-Mosquera*, 63 F.3d at 1153; *Cropp*, 127 F.3d at 359, insofar as they hold that "information about the precise number of years" a witness believes the he would have faced absent his cooperation with the government is commonly "outweighed by the potential prejudice [of] having the jury learn what penalties [a] defendant [is] facing." *Luciano-Mosquera*, 63 F.3d at 1153.

**3**

Having determined that Chandler was deprived of an adequate opportunity to cross-examine Sylvester and Yearwood, we must next inquire whether the District Court's error is one that requires reversal. We are again guided by *Van Arsdall*. Citing its earlier decision in *Chapman v. California*, 386 U.S. 18 (1967), the *Van Arsdall* Court held that when it has been established that a defendant's right to confront adverse witnesses was infringed by excessive limits on cross-examination, the reviewing court must then determine whether the error was harmless. *See Van Arsdall*, 475 U.S. at 684. The Court explained:

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

> *Cf. Harrington* [*v. California*, 395 U.S. 250, 254 (1969)],
> *Schneble v. Florida*, [405 U.S.427, 432 (1972)].

*Id.*

After reviewing the record in this case, we cannot say that the District Court's error was harmless beyond a reasonable doubt. Several facts lead us to this conclusion. First, although Kathleen Yearwood and Sly Sylvester were not the only witnesses who testified against Chandler, they were important to the government's case. Of the government's nine witnesses,[4] three were law enforcement officers: Pennsylvania narcotics agent David Nale, Special Agent Charles Dahlmann of the U.S. Treasury, and Moon Township police officer Douglas Busch. Although their investigation had involved surveillance, fingerprint evidence, garbage searches, undercover drug purchases, and the use of informants who recorded conversations among the co-conspirators, none of these three could supply any direct evidence of Chandler's involvement in drug trafficking, the offense of which Chandler was found guilty. Nor did William Yearwood and Annette Yearwood, both of whom could testify only that Linda Chandler, along with others, was present in their house when drug transactions took place, provide such evidence. The testimony of the remaining co-conspirators—Baker, White, Sylvester and Kathleen Yearwood—therefore was essential in showing that Chandler was criminally involved. All four testified pursuant to plea agreements, and, as Mr. Scoratow attempted to show, all had motives to implicate Chandler. Mr. Scoratow also showed the jury that several of the co-conspirators had provided testimony inconsistent with their prior representations. For example, although Baker testified at Chandler's trial that he had never used cocaine, earlier he told probation officers that he had a cocaine "problem." Because so much depended on the credibility of the cooperating witnesses, additional information about their

---

4. In order of their appearance, the government's nine witnesses were (1) Moon Township police officer Douglas Busch, (2) Pennsylvania narcotics agent David Nale, (3) Sly Sylvester, (4) William Baker, (5) Frederick White, (6) William Yearwood, (7) Annette Yearwood, (8) Kathleen Yearwood, and (9) Special Agent Charles Dahlmann of the U.S. Treasury.

motives in testifying might have proven decisive. In light of these facts, we lack "a sure conviction" that the District Court's limitations on cross-examination "did not prejudice the defendant"; nor can we say that it is " 'highly probable' that the district court's errors did not contribute to [the] jury's judgment of conviction." *Casoni*, 950 F.2d at 902 (citations omitted). Accordingly, we will reverse and remand for a new trial.

ROTH, Circuit Judge, dissenting:

The Majority's decision to remand this case for a new trial is based on only two questions. The District Court excluded both questions when the government objected to them. The first question, asked by defense counsel to Sly Sylvester, was

> Q. Did anyone explain to you what the penalties for five kilos is under the guidelines?

> MR. RIVETTI: Your Honor, I object to these questions regarding the penalties for five kilos.

> THE COURT: Okay. Penalties should not be discussed in the case, I would agree.

The second question, asked by defense counsel to Kathleen Yearwood, was

> Q. And you know that you're here, you're facing a heavy sentence — what did your attorney, Mr. Reister, tell you you're facing?

> MR. RIVETTI: Your Honor, again I object to discussing the penalties here.

> THE COURT: The objection is sustained. I think the point's been made that she knows by testifying she might get a reduction.

Both questions are addressed to the *specific penalty* to be imposed for a particular offense — either the offense with which the witness was charged or the offense with which the witness could have been charged if the government had not charged him with a lesser offense in return for testifying against his co-conspirators.

As established in *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986), cited by the Majority, the District Court, when it limits cross-examination, should consider the potential effect of the foreclosed cross-examination on the jury's evaluation of the witness. Here, defense counsel had cross-examined Sylvester and Yearwood about their cooperation agreements with the government and the benefits each hoped to get as a result of testifying against Chandler, including the benefit Sylvester received by being charged

with dealing only in 3 ounces of cocaine, rather than in five kilograms. I believe that, as a consequence of the decision in this case, a district judge in the future will have to conclude that, if a cooperating witness has been cross-examined about the benefits of his or her bargain with the government and defense counsel wants to go further to inquire about the specific penalty which could have been imposed on that witness, the question *must* be permitted. I consider such a limitation on the District Court's wide discretion in controlling cross-examination to be unwarranted.

First, it is well recognized that, when cross-examination has presented a sufficient opportunity to expose witness bias, there is very little probative value in a question about the precise sentence which the witness might face. *See United States v. Luciano-Mosquera*, 63 F.3d 1142, 1153 (1st Cir. 1995). In such circumstances, the District Court may properly limit cross-examination to preclude testimony about the penalty which might be imposed. *Id.*; *see also Brown v. Powell*, 975 F.2d 1, 5 (1st Cir. 1992);[5] *United States v. Ambers*, 85 F.3d 173, 176 (4th Cir. 1996); *United States v. Cropp*, 127 F.3d 354, 359 (4th Cir. 1997). My review of the record here convinces me that both Sylvester's and Yearwood's motives, in testifying to obtain benefits from the government for their cooperation, had been spelled out to the jury by cross-examination. At that point, there comes into play the discretion which is accorded to the District Judge to control the extent of cross-examination. *See United States v. Casoni*, 950 F.2d 893, 918-19 (3d Cir. 1992). The Court of Appeals should not second guess the decision, either to admit the question on exact penalty or to exclude it. Indeed, I do not have to agree with the trial judge's decision to admit or exclude in order to acknowledge that that decision is permitted within the allowed scope of discretion.

---

5. Judge Pollak, the author of the Majority's decision here, dissented in *Brown* on the ground that the defendant was not afforded "the constitutionally required threshold level of inquiry" if the exact penalty he escaped by cooperating with the government was not disclosed to the jury. *Id.* at 6.

Moreover, there are well-recognized reasons to exclude testimony on the exact penalty a cooperating witness might face. When the defendant on trial has committed offenses similar to those committed by a cooperating witness, the impact of the extent of the potential penalty may deter the jury from making a finding of guilt. *See Cropp*, 127 F.3d at 358-59. Furthermore, the difficulty under the U.S. Sentencing Guidelines of estimating what the ultimate penalty may be has discouraged trial courts from opening up the subject. *See Ambers*, 85 F.3d at 176-77.

In arriving at the decision that Chandler was deprived of an adequate opportunity to cross-examine Sylvester and Kathleen Yearwood, the majority concludes that *Davis v. Alaska*, 415 U.S. 308 (1974) governs its analysis. In *Davis*, the trial court had prohibited the defendant from cross-examining a key prosecution witness about his status as a juvenile probationer. The Supreme Court held that the defendant should not have been precluded from probing the witness's possible bias in testifying. *Id.* at 319. I find, however, that *Davis* is distinguishable from the present case in that here the defendant was permitted to probe the existence of bias in the expectation of both Sylvester and Kathleen Yearwood that their testimony would result in a lesser punishment for them. The complaint here is not that the probing of bias was prohibited entirely but that the extent of the probing was limited. From my review of the record, I conclude that this limitation was permissible under *Van Arsdall* and that *Davis* does not speak to the crucial issue before us of the limitation, rather than the prohibition, of cross-examination which is aimed at probing bias.

Finally, even if cross-examination as to the exact penalty that might be imposed on Sylvester and Kathleen Yearwood should have been permitted, I would nevertheless affirm Chandler's conviction because, in light of the extensive evidence against her, the error was harmless. For example, included in the testimony given by government witnesses, but not mentioned by the Majority, was the fact that Chandler made repeated deposits into a bank account of large amounts of cash, totaling over $8,000, when she had no legitimate source for these funds. In addition, Kathleen

Yearwood's sister, Annette, testified that she overheard Chandler and Kathleen discussing cocaine trafficking activities and that "more than a few times" when Chandler and other co-conspirators were in Annette's New York apartment, Annette saw "lots of money" on the kitchen table and once or twice she saw packaged drugs. I believe that both of these examples give direct evidence of Chandler's involvement in drug trafficking. Therefore, unlike the Majority, I cannot conclude that the limitation of cross-examination contributed to the jury's judgment of conviction.

For the above reasons, I respectfully dissent from the Majority's conclusion that Chandler's judgment of conviction should be reversed.

A True Copy:
Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*