NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-1894
_____

UNITED STATES OF AMERICA

v.

CORNELIUS NEWBERN,
a/k/a Corn

Cornelius Newbern,
Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-08-cr-00318-002)
District Judge:  Honorable Arthur J. Schwab

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
October 25, 2011

Before:  FISHER, VANASKIE and ROTH, *Circuit Judges*.

(Filed: November 17, 2011)
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Cornelius Newbern was convicted on one count of interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a)(2). He appeals his judgment of conviction and sentence. For the reasons stated below, we will affirm.

I.

We write exclusively for the parties, who are familiar with the factual and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

Danielle Scalzitti was a seventeen-year-old drug addict, who worked as a prostitute to support her habit. Her "boyfriend," Andrew Pearson, served as her pimp. In November 2007, Scalzitti and Pearson traveled from Chicago to Pittsburgh so Scalzitti could work as a prostitute for a Pittsburgh madam named Paula Washington ("Ms. Washington"). Ms. Washington was married to Willis Washington, who also went by the name Silky. After Scalzitti had worked for Ms. Washington for several days, Silky called Pearson and told him that Scalzitti had decided to leave Pearson and work for the Washingtons. The next day, Scalzitti called Pearson to inform him that she had only agreed to stay with the Washingtons after being physically intimidated by Silky. Shortly thereafter, Scalzitti left Pittsburgh and reunited with Pearson.

After returning to Chicago, Pearson approached Newbern, a long-time friend, and asked Newbern to accompany him to Pittsburgh. Pearson testified that he told Newbern

2

about the incident with the Washingtons, and asked if Newbern would assist in an extortion plot. The plan was for Scalzitti to call Ms. Washington, tell her that she had again left Pearson, and ask Ms. Washington to pick her up at a bus stop in Pittsburgh. Pearson and Newbern would follow Ms. Washington to an apartment and rob her. Pearson explained that in preparation for their trip, Newbern obtained a handgun and a BB gun, and because neither Pearson nor Scalzitti could drive, Newbern agreed to rent a car for the group. At trial, Newbern denied being part of any such plan, and instead insisted that he went to Pittsburgh to promote his art to area museums. In December 2007, Pearson, Newbern, and Scalzitti traveled from Chicago to Pittsburgh Although it is unclear exactly what was discussed during the drive, Pearson testified that they discussed various courses of action, "mostly, how we intended to . . . take Silky, or you know, take Paula, whoever was there at the house. . . . The plan was for us to . . . hold them there, because I had planned to beat Silky up."

Upon arriving in Pittsburgh, Pearson and Newbern dropped Scalzitti off at the bus stop and waited for Ms. Washington to arrive. When she did, the two men followed her to an apartment that she used as a brothel. Pearson entered the apartment first, and quickly discovered Scalzitti and Ms. Washington. He beat Ms. Washington and demanded that she give him money. Newbern entered the apartment shortly thereafter, and although he told Pearson to "take it easy," he did not attempt to physically stop the assault. According to Pearson, Newbern simply reminded him that "we came here for the

3

money." Scalzitti then bound Ms. Washington's hands with duct tape. Although Newbern disputes this, Ms. Washington testified that Newbern assisted Scalzitti in tying her up. Pearson then forced Ms. Washington into a car and the group drove to the Washingtons' home. Newbern followed in the rental car. During the drive, Pearson called Silky and attempted to extort him. By the time they arrived, Ms. Washington had managed to loosen the duct tape and when the car stopped, she opened the door and escaped. Scalzitti testified that Silky then exited the house and began to shoot at her and Pearson. Pearson and Scalzitti quickly drove off and reunited with Newbern, who was still driving the rental car. The three individuals then returned to Chicago.

On August 19, 2008, a federal grand jury in the Western District of Pennsylvania returned a two-count indictment against Pearson and Newbern. Count One charged the two men with traveling in interstate commerce with the intent to commit a crime of violence, in violation of 18 U.S.C. § 1952(a)(2). Prosecutors proceeded against Newbern on a theory of aiding and abetting. Count Two charged Newbern and Pearson with carjacking, in violation of 18 U.S.C. § 2119(2). Pearson pled guilty but Newbern proceeded to trial. He was convicted on Count One, but acquitted on Count Two. He was sentenced to 121 months' imprisonment to be followed by a three-year term of supervised release. Newbern filed a timely notice of appeal.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1).

Newbern first challenges his conviction on the basis that the District Court committed reversible error by instructing the jury that an element of the offense of aiding and abetting had been met as a matter of law. To obtain a conviction for aiding and abetting, the government must prove that: (1) the substantive crime has been committed; (2) the aider or abettor knew that the principal was committing the crime; (3) the aider or abettor had the purpose to aid; and (4) the aider or abettor actually rendered aid or assistance. *United States v. Nolan*, 718 F.2d 589, 592 (3d Cir. 1983) (citation omitted). In this case, the District Court instructed the jury, "Mr. Pearson has already acknowledged his guilt to [the substantive] offenses charged and, therefore, the Court instructs you that element one has been met as a matter of law." This instruction was erroneous. Plea agreements of co-defendants cannot be used as substantive evidence of a defendant's guilt. *United States v. Gaev*, 24 F.3d 473, 476 (3d Cir. 1994). "The defendant has a right to have his guilt or innocence determined by the evidence presented against him, not by what has happened with regard to a criminal prosecution against someone else." *Id.* (citations omitted).

When a district court fails to submit an element to the jury, we review for harmless error. *Neder v. United States*, 527 U.S. 1, 15 (1999). An error is harmless if "it can be

5

'proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Waller*, 654 F.3d 430, 434 (3d Cir. 2011) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). If the record contains evidence "that could rationally lead to a contrary finding with respect to the omitted element," the error is not harmless. *United States v. Barbosa*, 271 F.3d 438, 459 (3d Cir. 2001) (citation omitted).

We find that the District Court's erroneous instruction in this case was harmless. The Government was required to prove beyond a reasonable doubt that Pearson committed the substantive offense of traveling in interstate commerce with the intent to commit a crime of violence. *See* 18 U.S.C. § 1952(a)(2). Although Newbern now claims that he contested Pearson's guilt, the record indicates otherwise. In fact, Newbern's trial strategy seems to have been to show that Pearson acted alone in planning and committing the crime. At no point in Newbern's testimony did he challenge Pearson's statement regarding his own guilt. Moreover, contrary to Newbern's assertions, the evidence presented at trial established beyond a reasonable doubt that Pearson traveled in interstate commerce with the requisite intent. Pearson himself admitted to committing the crime, he testified that he discussed his plan with Newbern during the trip from Chicago, and Scalzitti testified regarding her prior interactions with the Washingtons, which gave Pearson a motive to seek revenge. Thus, we "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 19.

6

The second basis asserted by Newbern for overturning his conviction is that the District Court violated his rights under the Confrontation Clause by precluding cross-examination of Ms. Washington regarding Silky's vulnerability to criminal prosecution. Newbern sought to expose Ms. Washington's pro-Government bias by eliciting testimony that Silky, who was prohibited from possessing a firearm, shot at Scalzitti and Pearson, but was not prosecuted for those actions. The Government objected and the District Court sustained the objection, stating that the proposed line of questioning was not relevant or probative, and that there was no basis for Newbern's assertion that the charging decision regarding Silky was in any way related to Ms. Washington's testimony.

We review impositions on the scope of cross-examination for abuse of discretion. *United States v. Chandler*, 326 F.3d 210, 213 (3d Cir. 2003). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). However, the Confrontation Clause does not prevent a trial judge from imposing "any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Id.* at 679. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.*

7

We have outlined a three-step inquiry for determining whether a limitation on the scope of cross-examination violates a defendant's rights under the Confrontation Clause. First, we must determine "whether [the] ruling significantly inhibited [the defendant's] effective exercise of [his] right to inquire into [the] witness's 'motivation in testifying.'" *Chandler*, 326 F.3d at 219. This depends on "whether the jury had sufficient other information before it, without the excluded evidence, to make a discriminating appraisal of the possible biases and motivation of the witnesses." *Id.* (citations omitted). If the trial court's ruling does inhibit the defendant's constitutional rights, we ask "whether the constraints it imposed on the scope of . . . cross-examination fell within those 'reasonable limits' which a trial court, in due exercise of its discretion, has authority to establish." *Id.* Finally, even if the trial court abused its discretion, we will nevertheless affirm if the error was harmless. *Id.* at 224.

Here, we conclude that the District Court's ruling barring Newbern's counsel from inquiring into Ms. Washington's potential bias did not "significantly inhibit [his] effective exercise" of his right to cross-examination. *See id.* at 219. The jury had before it ample evidence of Ms. Washington's motivation to offer testimony favorable to the Government. Ms. Washington had previously been convicted for prostitution conspiracy, but pursuant to a plea agreement, she had cooperated with the government and received a reduced sentence. She also cooperated in a state investigation in return for charges being dropped. She was thus well aware of the benefits of cooperating with a government

8

investigation. Here, prosecutors declined to charge her with Scalzitti's prostitution. It would be plain to a jury that Ms. Washington had a motive to testify favorably for the Government. Thus, although the incentive to protect one's family is distinct from the incentive to protective oneself, *United States v. Lankford*, 955 F.2d 1545, 1549 n.9 (11th Cir. 1992), a trial judge is not required to allow inquiry into every potential basis for bias, *Van Arsdall*, 475 U.S. at 679. As such, the District Court was not constitutionally required to allow Newbern's counsel to question Ms. Washington regarding Silky's non-prosecution.

However, even if the District Court's ruling did inhibit rights protected by the Confrontation Clause, it was not an abuse of discretion to bar Newbern's proposed line of questioning. When asked to offer some proof of a connection between the Government's decision not to prosecute Silky and Ms. Washington's testimony, Newbern's counsel could offer no specific evidence. "Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis" for the line of questioning. *United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983). Although Newbern correctly notes that a defendant is not required to present evidence of an express non-prosecution agreement to inquire into a witness's potential pro-government bias, *United States v. Anderson*, 881 F.2d 1128, 1139 (D.C. Cir. 1989), Newbern failed to make any connection at all. Additionally, a trial court properly

9

exercises its discretion when it bars a line of questioning that could confuse the jurors. *Van Arsdall*, 475 U.S. at 679. Here, inquiry into Silky's potential criminal liability could have resulted in a mini-trial regarding whether he actually fired a gun at Pearson and Scalzitti, which could have distracted jurors from the key issues in the case. Thus, the District Court did not abuse its discretion in limiting the scope of cross-examination in the manner that it did.

Assuming, *arguendo*, that the District Court's ruling was an abuse of discretion, we nevertheless find that the error was harmless. Although Ms. Washington's testimony was important to the Government's case, further impeachment regarding her motivation to testify favorably for the Government would have been cumulative. *See Van Arsdall*, 475 U.S. at 684. The District Court permitted extensive cross-examination regarding her potential bias. *See id.* Moreover, Scalzitti and Pearson corroborated much of Ms. Washington's testimony regarding Newbern's involvement in the crime. *See id.* Thus, even if the "damaging potential of the cross-examination [was] fully realized," the jury verdict would have been the same. *See id.*; *United States v. Hinton*, 423 F.3d 355, 362 (3d Cir. 2005).

Newbern next argues that the District Court committed reversible error by denying his motion for a mistrial based on a comment made by the prosecutor during closing arguments. We find Newbern's contention to be without merit. On cross-examination, the prosecutor asked Newbern if anyone could corroborate that he traveled to Pittsburgh

to promote his art. He said that the only person who could do so was his girlfriend, Gail Binyon. The prosecutor then asked why Newbern did not subpoena her to testify. During closing argument, the prosecutor asked the jury to consider Newbern's failure to present as a witness the only person who could corroborate his story. Newbern contends that these comments erroneously led the jury to believe that he had an obligation to introduce evidence to establish his innocence.

"We review a district court's decision to deny a motion for mistrial predicated on the grounds that the prosecutor made improper remarks in a closing argument for abuse of discretion." *United States v. Wood*, 486 F.3d 781, 786 (3d Cir. 2007) (citation omitted). Because the prosecutor was permitted to follow the contested line of inquiry on cross-examination and during closing argument, the District Court did not abuse its discretion in denying Newbern's motion for a mistrial. "It is perfectly proper to comment on the failure of the defense to call a potentially helpful witness, at least where . . . the comment could not be construed as a comment on the failure of the defendant to testify." *United States v. Keller*, 512 F.2d 182, 186 (3d Cir. 1975) (citations omitted). Here, it was appropriate for the prosecutor to ask Newbern why he did not subpoena Binyon, who would be a "potentially helpful witness" given that she was the only person who could corroborate his story. *See id.* It was also proper to discuss Newbern's testimony on this issue during summation.

Newbern cites our dicta in *United States v. Molina-Guevara*, 96 F.3d 698, 703 n.1 (3d Cir. 1996), in which we opined that it may not be appropriate to comment on the defendant's failure to present a witness where the witness is unavailable or privileged, where the witness might be expected to be biased against one party, or where the witness is equally available to both sides and the testimony is likely to benefit neither. None of these scenarios are present in this case. Binyon is not unavailable; the fact that she is taking care of Newbern's child does not establish unavailability as a matter of law. *See United States v. Kelly*, 892 F.2d 255, 262 (3d Cir. 1989). Despite Newbern's assertions to the contrary, there is no reason to think that Binyon would be biased against Newbern. *See Molina-Guevara*, 96 F.3d at 703 n.1. Although she was vulnerable to criminal charges, in addition to having a child with Newbern, she specifically tried to help him avoid criminal liability in this case. And if, as Newbern claims, she would corroborate his story that he traveled to Pittsburgh to explore art opportunities, her testimony would clearly be more likely to benefit Newbern. *See id.*

Finally, Newbern alleges that the District Court erred in imposing a four-level enhancement under U.S.S.G. § 2B3.2(b)(3)(A)(iv) for use of a dangerous weapon during commission of the offense, and requests that we remand for re-sentencing. We review the District Court's interpretation of the U.S. Sentencing Guidelines de novo and its factual findings for clear error. *United States v. Lianidis*, 599 F.3d 273, 278 (3d Cir. 2010). Section 2B3.2(b)(3)(A)(iv) of the Sentencing Guidelines provides for a four-level

enhancement "if a dangerous weapon [is] otherwise used." "Otherwise used" is defined as "conduct [that] did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." U.S.S.G. § 1B1.1 cmt. n.1(I). Here, Pearson "otherwise used" a dangerous weapon when he pistol-whipped Ms. Washington with the BB gun.

The District Court determined that, under U.S.S.G. § 1B1.3(a)(1)(B), Newbern was responsible for the conduct of Pearson and Scalzitti that was "reasonably foreseeable" and "in furtherance of the jointly undertaken criminal activity." The District Court found that it was reasonably foreseeable that Pearson would use the gun in the manner that he did. This finding was not clearly erroneous. Pearson testified that Newbern supplied him with the gun, and thus knew that he had the weapon. Newbern traveled to Pittsburgh with Pearson for the purpose of robbing the Washingtons, one of whom was known to be a pimp, and Newbern was present during part of Pearson's beating of Ms. Washington. Based on these facts, the District Court's finding that it was reasonably foreseeable to Newbern that Pearson would use the gun to physically assault Ms. Washington was not clearly erroneous. Thus, we will affirm the sentence imposed by the District Court.

## IV.

For the foregoing reasons, we will affirm the judgment of conviction and the judgment of sentence of the District Court.

13